## MONTGOMERY et al. v. CITY OF ATLANTA et al.

1. Before the City of Atlanta can pass an ordinance and make a valid contract for the paving or repaving of a street, under the amendment to its charter by the act of August 19, 1919 (Georgia Laws 1919, p. 821), and before it can pass a valid ordinance levying an assessment against owners of land abutting on such street or portion of street for their shares of the cost of such street improvement, it must be petitioned in writing for such street improvement by the owners of the majority of the frontage of land abutting on said street or portion of said street. This fact is jurisdictional; and the non-existence thereof renders an ordinance and contract made for such purpose invalid.

(a) The owners of abutting property may be precluded from attacking the validity of such ordinance and contract on this ground, by their failure to make timely objections thereto. Paragraph (b) of section 1 of this act provides for an advertisement giving notice of the introduction of the resolution or ordinance for such street improvement, which shall notify the property owners to appear at the meeting of the general council to be held at a time stated in the advertisement, and make any and all objections they may desire to urge to the passage of such resolution or ordinance; and provides for full opportunity for such owners to make objections to the passage of the ordinance. After hearing any objections, the general council has the full right and power

---

Constitutional Law, 12 C. J. p. 1261, n. 89, 90.

Contracts, 13 C. J. p. 435, n. 89, 90; p. 506, n. 80.

Equity, 21 C. J. p. 172, n. 13.

Municipal Corporations, 28 Cyc. p. 650, n. 65; p. 653, n. 73; p. 654, n. 77; p. 676, n. 33; p. 960, n. 37; p. 975, n. 99; p. 980, n. 48; p. 1014, n. 38; p. 1136, n. 64; p. 1174, n. 13, 24; p. 1187, n. 34 New.

in their discretion to order such street improvement to be made, or to reject the ordinance proposing such improvement. After the passage of such ordinance, all property-owners subject to be assessed for the cost of the improvement, who do not within fifteen days thereafter commence legal proceedings to prevent such assessment being made, shall be conclusively presumed to have accepted the terms of said ordinance, and to have agreed that the assessment provided for in said act may be made. Property-owners who, after due publication of said advertisement, fail to file any objections to the passage of the proposed ordinance for such street improvement, and who fail to take legal proceedings within fifteen days after the passage of said ordinance to prevent its passage and the assessment of their property for such improvement, are concluded and barred from taking proceedings to attack the validity of said ordinance for lack of such jurisdictional fact.

2. By section 100 of the charter of the City of Atlanta, it is unlawful for any member of the general council of the City of Atlanta to be interested, either directly or indirectly, in any contract with the City of Atlanta, the mayor and general council, or any one or more of them, having for its object the public improvement of the city or any part thereof, or the expenditure of its money; and a violation of this section by any member of the general council is made a misdemeanor, which is punishable under section 1065 of the Penal Code of this State. A contract between the City of Atlanta and a construction company, in which a member of council is a large stockholder, is null and void, although such member of council did not vote for the ordinance authorizing such contract, and did not use his influence in procuring other members of council to approve and authorize the making of such contract, and although such contract is fair and free from fraud.

3. Where the contract for the construction of a public improvement has been made by the City of Atlanta, and an assessment has been levied to pay the contract price of such improvement, the validity of such contract is essential to the validity of the assessment, and if the contract is invalid the assessment is invalid.

4. Equity requires every litigant who seeks her aid to do equity; and inasmuch as the construction company has expended large sums of money in making this street improvement, of which the city and the plaintiffs have received the benefit, equity will not interpose in behalf of the plaintiffs to annul and set aside the contract for such improvement and the assessment levied against them as owners of abutting property for their shares of the cost of such improvement, although such contract and assessment are illegal and invalid, unless the plaintiffs shall first do equity; and to do equity the plaintiffs must pay their proportionate shares of the cost of making such improvement, in the absence of actual fraud on the part of the construction company.

5. Under the contract between the city and the construction company for this street improvement, the city agreed to issue bonds to cover the total cost of such improvement, and thereupon to promptly dispose of these bonds and pay the contractor such sums as might be due it for the paving of this street. The trial judge enjoined the city from paying to the contractor any money other than that received from the property-owners, and enjoined the city from pressing proceedings to

validate such bonds, pending the final decision of this case. Apply-
ing the principle announced in the preceding headnote, the trial judge
erred in so enjoining the city at the instance of the plaintiffs who were
seeking affirmative equitable relief.

Nos. 5230, 5231.  July 15, 1926.

Petition for injunction.  Before Judge Humphries.  Fulton su-
perior court.  November 12, 1925.

In February, 1924, a petition was circulated among property-
owners on Ponce de Leon Avenue in Atlanta, to pave said street
from Peachtree Street to the Southern Railway.  This petition
was signed by some of the property owners at that time, among
whom was R. J. Spiller, who signed for 1550 feet; but on account
of the fact that the movants in this matter did not get a sufficient
number of signatures, the petition was not presented to the city
government until October 6, 1924.  The total frontage on both
sides of that portion of said street that was to be paved, was 11,-
312 feet.  The frontage owned by the signers of said petition was
6,622 feet.  The amount of frontage necessary to be signed for
in order to make a majority of the frontage of said portion of said
street was 5,667 feet.  It took the amount of frontage for which
Spiller signed to make this majority.  At the time Spiller signed
the petition he was the owner of 1557 feet of this frontage.  On
February 16, 1924, Spiller conveyed this property, with this
frontage owned by him, to R. J. Spiller Incorporated, and his
deed of conveyance was recorded on February 25, 1924.  On the
presentation of said petition to the general council of the city it
was referred to a committee; and bids were called for for the work
to be done.  Bids were submitted on October 20, 1924, and the
bid of MacDougald Construction Company was recommended for
acceptance by the committee.  On November 3, 1924, an ordinance
was introduced in council to pave said portion of said street. This
ordinance recited that the petition was signed by the owners of
more than fifty per cent. of the property abutting upon the por-
tion of the street to be paved.  This petition was accompanied by
the certificate of the chief of construction that the petition was
signed by the owners of more than fifty per cent. of the property
abutting on said portion of said street.  By order of council passed
on November 5, 1924, notice of the introduction of this ordinance
was duly published.  In this notice it was stated that said ordi-
nance would be taken up for consideration by the mayor and gen-

eral council on November 17, 1924, and that property-owners and others interested were invited to appear at that time and urge any objections they might wish to make thereto. The notice specified the character of pavement and the price thereof. On November 17, 1924, there being no objection urged, said ordinance was duly passed by council. On November 20, 1924, it was duly concurred in by the aldermanic board. On November 21, 1924, it was duly approved by the mayor. On the same dates the recommendation of the street committee of council, of November 14, 1924, that the bid of the MacDougald Construction Company be accepted, was adopted by council and the aldermanic board and approved by the mayor. No legal proceedings were instituted by any one within fifteen days from the passage of these ordinances, to prevent the carrying out of the same, or to prevent the repaving of the street as provided therein.

At the time these matters were presented to and passed on by the city government, E. H. Inman was a member of the city council, and at the same time was a large stockholder in the MacDougald Construction Company. Besides, he was surety for this company for various paving contracts previously made with the City of Atlanta, and was surety on large amounts of its maintenance bonds and for large sums of money due by this company to banks, was a large creditor of the company, and was receiving dividends out of the profits of this company. On November 28, 1924, a contract was entered into between the city and the MacDougald Construction Company for the repaving of the street in accordance with the terms of said ordinance. The contractor began the work in December, 1924, and completed it about July 5, 1925. The contractor furnished all the material and labor in making the improvements. The work was done to the entire satisfaction of the chief of construction, who officially reported to this effect to the mayor and general council on July 6, 1925. He further reported that the entire expense of the improvement was $130,130.00, that the amount due by the street-railway company was $31,245.66, and that the basis of the assessment against abutting property owners was $8.8094532 per front foot, which was twenty-seven cents per front foot less than the estimated cost of the work. On July 6, 1925, the general council passed an order, which was approved by the mayor, accepting the work of repaving

the street, as done in accordance with the contract, the plans and specifications, and with all of the requirements of the City of Atlanta, and assessing the entire cost thereof against the street-railway company and the abutting-property owners. Later the council and aldermanic board passed an ordinance by a two-thirds vote of the members thereof, which was duly approved by the mayor, providing for an issue of bonds to cover the costs of the improvements. On July 25, 1925, a proceeding was begun in the superior court of Fulton County to validate the bond issue. The rule nisi therein was made returnable on August 8, 1925.

On August 7, 1925, the original petitioners in this case, nearly all of whom had signed the petition asking for the repaving of said portion of said street, began the present action against the City of Atlanta and MacDougald Construction Company, in which they sought to enjoin the enforcement of the paving ordinance, the contract, the assessments against the abutting property so improved, and the validation of the bonds; to enjoin the city from collecting any amount whatever from abutting-property owners, or from paying any sum whatever to the MacDougald Construction Company; and to enjoin the MacDougald Construction Company from collecting anything for its work and materials in improving the street. They prayed that the paving ordinance, the contract, the assessing ordinance, the bond ordinance, and all proceedings in connection with the repaving, be declared null and void; and that the city be restrained from proceeding to validate said bond issue, and from altering or changing the status of the MacDougald Construction Company, the city, and the property owners. The grounds upon which petitioners sought this relief were: (1) that the petition for the repaving was not signed by the owners of more than fifty per cent. of the property abutting on the portion of said street sought to be repaved; (2) that when the above ordinances were passed, the contract made, and the work done, E. H. Inman was a member of council and a stockholder and financially interested in the MacDougald Construction Company; (3) that at the same time Harry York, a member of council, was an agent for a bonding company, and as such received a commission on the bond signed by his company and given by the MacDougald Construction Company to the city to guarantee the faithful performance of the contract; and (4) that the repaving was of inferior

quality and not in accordance with the contract. On August 7, 1925, the judge temporarily enjoined the defendants as prayed by petitioners. After this controversy arose, E. H. Inman resigned as a member of the city council, and immediately upon his resignation the city government passed a new ordinance reassessing the cost of this pavement, and passed a resolution ratifying and affirming the contract, and approving and accepting the work. At the time this action was taken there was in force the order of the court restraining the defendants from doing any act toward the collection or enforcement of their claims, or from altering or changing the status between the parties respecting the matters in controversy.

On the hearing the plaintiffs introduced said ordinance adopted by the city council November 17, 1924, concurred in by the aldermanic board on November 20, 1924, and approved by the mayor on November 21, 1924. They introduced the original petition of property-owners for the paving of the street, reciting that they were owners of real estate abutting on this street between Peachtree Street and the Southern Railway, and that the petition was filed by virtue of the act of August 19, 1919, whereby the assessment for such pavement may be paid in ten installments. The same was signed by fifty-six property-owners, owning a total of 6,410-4/5 feet. Among them was "R. J. Spiller, 1557 feet." They also introduced the ordinance adopted by the general council on July 6, 1925, and approved by the mayor on July 7, 1925, levying assessments against the property-owners for their portions of the cost of said pavement. It was stipulated between the parties that E. H. Inman was, during the times mentioned in the petition, and is now the brother-in-law of Alexander MacDougald, president of the MacDougald Construction Company, that the MacDougald Construction Company was organized on April 29, 1919, with a capital stock of $50,000, of which Inman subscribed $23,500 in cash, John N. Goddard $10,000, and Alexander MacDougald $16,500 paid in property. On the organization of said company Inman was elected director and treasurer of the corporation, which office he held until July 14, 1923, at which time his son was elected in his stead. In August, 1923, the capital stock of the company was increased by the issuance of $50,000 preferred stock. Inman subscribed for $24,500 of this stock, which has

paid eight per cent. dividends.  The deed from R. J. Spiller to R. J. Spiller Incorporated, dated February 16, 1924, on consideration of $50,000, conveyed the 1557 feet on Ponce de Leon Avenue, and was recorded July 25, 1924.  The resolution of the city council, adopted on November 17, 1924, accepted the bid of MacDougald Construction Company to pave said portion of Ponce de Leon Avenue for $2.85 per square foot.  It was shown that Harry York was an employee of Haas & Haas, upon a salary.  This firm represented the insurance company which was on the bond of the contractor for the faithful performance of its contract for this street improvement.  York received no part of the premiums paid the insurance company for this bond.  The minutes of R. J. Spiller Incorporated showed that on April 24, 1924, the directors of this company were R. J. Spiller, E. E. Pomeroy, Ronald Ransom, Henry B. Kennedy, and Harold Hirsch.  A resolution passed by the directors of this company on the same day provided that no lease or contract involving over $500, or salaries over $200 per month, could be made without the approval of the board of directors.  Plaintiffs introduced evidence tending to show that this pavement was not properly laid by the contractor.

Defendants introduced evidence authorizing a finding that the pavement was properly laid and in full compliance with the terms of the contract.  There was evidence that R. J. Spiller requested the contractor to complete the pavement in front of the baseball park before the baseball season started, and to finish both sides of the street, if possible, but for God's sake to finish one side for him.  By extra exertion this was done.  There was evidence that E. H. Inman did not vote for any of the ordinances above referred to, and did not influence members of council in any way to secure the passage of this ordinance, and had nothing to do with the making of the contract; and evidence tending to show that plaintiffs knew that Inman was a member of the city council when the above ordinances were passed and the contract for this pavement was made, and that they knew of the laying of the pavement and that it was done under said ordinances and contract.  The city collected in cash and notes, through September, 1925, $71,060.41 on this pavement, all of which were voluntary payments, and $38,460.00 of this amount was collected after suit was filed.  The

street-railway company paid in cash and notes the assessment against it for $31,245.66, for its part of this pavement.

The judge refused to enjoin the defendants from enforcing assessments against petitioners for this improvement, refused to enjoin the city from making payments to the MacDougald Construction Company out of the assessments collected by it from property-owners on said street, and permitted the city to file proceedings to validate the bonds to be used in part payment of the costs of said pavement. To this judgment the plaintiffs excepted. The judge enjoined the City of Atlanta from paying to the construction company any money other than that received from property-owners, and from paying to the construction company from its public treasury. To this part of the judgment the city excepted in a cross-bill of exceptions. The judge permitted the city to file validation proceedings to validate the baby bonds on this pavement, but enjoined such proceedings pending the final decision in this case. To this part of the order and judgment of the court the city likewise excepted. The defendants further excepted to the holding of the court that the contract between the Mac-Dougald Construction Company and the City of Atlanta was void, for the reason that the same was not void for any reason assigned, and because it had been fully ratified by council after Edward H. Inman had resigned as a member of council. The defendants further contend that the court erred in restraining them, as above set forth, on the ground that under the undisputed evidence the reasonable value of said paving was $130,130, that the city had accepted said work, acknowledged the reasonable value thereof, and was liable to the contractor for such value. They further set up that there was no equity in the petition, and that for this reason the court erred in restraining the defendants in the respects above set out.

*Edmund W. Martin, James L. Key,* and *Underwood, Pomeroy & Haas,* for plaintiffs.

*James L. Mayson, Courtland S. Winn, King, Spalding, MacDougald & Sibley,* and *Dorsey, Howell & Heyman,* for defendants.

HINES, J. (After stating the foregoing facts.)

1. The paving involved in this case was done under "An act to amend an act establishing a new charter for the City of Atlanta, approved February 28, 1874, and the several acts amendatory

thereof, and for other purposes," approved August 19, 1919. Ga. Laws 1919, p. 821. By par. (b) of section 1 of this act it is provided that "No resolution or ordinance seeking to pave, repave, or improve a street or public place as herein authorized shall be passed unless petitioned in writing by the owners of more than fifty per cent. of the property abutting on the street or portion of street proposed to be paved or repaved." The first attack upon the ordinances and the contract providing for the paving of a portion of this street, and the ordinance levying assessments against the owners of property abutting thereon for the payment of their shares of the cost of laying the pavement, is that the petition for the paving of this street was not signed by owners of more than fifty per cent. of the frontage of the property abutting on the portion of this street sought to be paved.

Before the city council can pass an ordinance and make a contract for the paving of a street, and before it can pass an ordinance levying an assessment against owners of land abutting on such street or portion of street, for the payment of their shares of the cost of laying such pavement, it must be petitioned in writing by the owners of a majority of the frontage of the land abutting on said street or portion of said street, seeking to have the pavement laid. This fact is jurisdictional. The non-existence of such fact renders ordinances and contracts made for this purpose null and void. In the absence of this jurisdictional fact an ordinance authorizing the pavement, and contract for laying the pavement, and an ordinance levying an assessment against abutting-land owners to pay for such pavement, are utterly void and unenforceable, if they are attacked in proper time. While this is so, the owners of abutting property may be precluded from attacking the validity of such ordinance and contract on this ground, by their failure to make timely objections thereto. Paragraph (b) of section 1 of this act provides for an advertisement giving notice of the introduction of the resolution or ordinance for the paving, repaving, or improvement of any public street, public place, or portion thereof, under this act. This advertisement shall notify the property-owners or others interested to appear at the meeting of the general council to be held at a time stated in the advertisement, and make any and all objections they may desire to urge to the passage of such resolution or ordinance. It further provides that at

the time named in said advertisement any property-owner or other person shall have full opportunity to make objections to the passage of such resolution or ordinance. It further provides that after hearing said objections the general council shall have the full right and power in their discretion to order such pavement, repavement or other improvements to be made, or reject said resolution or ordinance. It then provides that, after the passage of such resolution or ordinance, all property-owners subject to be assessed for the cost of the improvement, who do not within fifteen days thereafter commence legal proceedings to prevent said assessment being made, shall be conclusively presumed to have accepted the terms of said ordinance or resolution, and to have agreed that the assessment provided for in said act may be made. This act then provides that "Thereupon it shall be the duty of the mayor and general council to forthwith cause said improvements to be made in accordance with the plans and specifications as prepared," and that "When completed an ordinance shall be passed, assessing the cost of said improvement against the property-owners on each side of the street or portion of the street so paved, repaved, or improved, except that where a street-car company has tracks on said street or portion of street so improved, the company owning or operating same under lease or contract shall be assessed for the costs of paving, repaving, or improving said street or portion of street for the full distance that such tracks extend along said street or public place of such pavement, repavement, or improvement, and for the full width of sixteen feet where they have two tracks thereon and eleven feet where they have one track thereon, and, after deducting the amount of this assessment against said company, then the abutting-property owners shall pay the total assessment against the abutting property on each side of the street or portion of street so paved, repaved, or improved."

What was the purpose and intention of the legislature in enacting the above provisions of this act, and what is the effect of the failure of owners of abutting property to make objections to the passage of the ordinance providing for such pavement, and, in the event their objections to such ordinance are overruled by the general council, they do not within fifteen days thereafter commence legal proceedings to prevent the assessment of their property for the purpose of paying their pro rata shares of the cost of such im-

provement? The evident purpose of the legislature was to give property-owners or other persons interested full opportunity to make any objections which they might see fit to make to the passage of an ordinance providing for the pavement or repavement of any street or public place in the City of Atlanta, and to give them an opportunity to be fully heard before the general council. If their objections were overruled by the general council, the purpose of the act was then to give to property-owners the right to commence, within fifteen days after the passage of such ordinance, legal proceedings to prevent any assessment being made upon their property abutting on such street for the purpose of its pavement or repavement. Here ample legal means were provided for these property-owners to attack the ordinance of which they now complain, upon the ground which we are now considering. The petitioners, after being duly notified of the introduction and pendency of this ordinance, failed to make objection to its passage before the general council, and after its passage they failed to take legal proceedings within fifteen days thereafter to prevent the assessment of their property for the payment of their respective shares of the cost of the pavement therein provided. What is the effect of their failure so to do? The statute declares that they "shall be conclusively presumed to have accepted the terms of said resolution or ordinance, and shall have agreed that the assessment" in said act "provided for may be made." Clearly the purpose of the legislature was to make the averments of the petition conclusive upon the property-owners, and especially to conclude them from denying the jurisdiction of the general council to pass the ordinance, if they made no objection to the passage of the ordinance before the general council, and took no legal proceedings within fifteen days thereafter to attack its validity and to resist the contemplated assessment upon their property for the payment of their proportionate shares of the cost of the improvement. The act furnishes a method for the judicial determination of the validity of the ordinance and of the contemplated assessment against the owners of abutting property; and this satisfies the constitutional requirement of due process of law. *Lanham Co.* v. *Rome,* 136 *Ga.* 398 (71 S. E. 770).

. So in *City of Marietta* v. *Dobbins,* 150 *Ga.* 422 (104 S. E. 444), this court, in construing a statute similar to the one under

consideration, held that the provision that abutting-land owners could begin proceedings to prevent the assessment being made against their property for paving within fifteen days after the passage of the ordinance, and that upon their failure to do so they were to be conclusively presumed to have accepted the terms of the ordinance and to have agreed that the assessment provided for might be made, was in its nature a statute of limitation which would bar such owners from attacking the ordinance and assessment, if legal proceedings were not taken within fifteen days after the passage of the ordinance for such purpose. In view of the importance of having the jurisdictional fact ascertained that persons owning a majority of the frontage on a street or portion of a street sought to be paved had signed a petition for that purpose, we think the legislature intended to provide a method for the determination of this question, and to fix a period of limitation in which legal proceedings raising the question of the existence of such jurisdictional fact could be brought. By the act of August 1, 1921 (Acts 1921, p. 212), the certificate of the chief of construction, that the petition was signed by owners of more than fifty per cent. of the property abutting on the street or portion of the street sought to be paved, is made prima facie evidence of this fact. The act of 1919 makes this prima facie presumption conclusive, if the owners do not file objections to the passage of the preliminary ordinance providing for the pavement. The purpose of the legislature was to prevent the city and contractors from having this jurisdictional fact questioned after they had incurred large expenditures in making these street improvements. So we are of the opinion that when the general council published notice of the introduction and pendency of the preliminary resolution and its terms, providing for the pavement of a portion of this street, and notifying owners of property abutting thereon and other persons interested therein to appear at the meeting of the general council to be held at a time therein stated and to make any and all objections they might desire to urge to the passage of such resolution or ordinance, and where said property-owners failed to so appear and to make objections to the passage of such ordinance, and further failed within fifteen days after the passage of such ordinance to commence legal proceedings to prevent an assessment be-

ing made against their property for the payment of the cost of such pavement, they were barred, after fifteen days from the passage of such ordinance, from instituting legal proceedings to attack the ordinance upon the ground that the owners of a majority of the property fronting on said street had not signed the petition asking for its pavement or repavement. On this question see Bickel *v.* Warner-Quinlan Asphalt Company, 70 Okla. 138 (174 Pac. 537).

2. Is the contract between the city and construction company for the laying of this pavement void? The plaintiffs contend that the contract is void under section 100 of the charter of Atlanta, because Inman was a member of the city council and a large stockholder in the construction company at the time the contract was made. On the other hand, the city and the construction company maintain that the contract is not void, because (a) the above section of the city charter is not applicable under the facts of this case; (b) because Inman did not vote for the preliminary ordinance providing for this pavement, for the ordinance accepting the bid of his company for this work, and for the ordinance accepting the pavement after it was finished, and did not use his influence to induce members of council to vote for them, nor take any part in securing the execution of the contract; (c) because the contract is fair and free from fraud; and (d) that after this controversy arose Inman resigned from the council, which thereafter passed an ordinance or resolution ratifying and confirming the ordinances aforesaid, and the contract, and the acceptance of the pavement laid thereunder by the city.

By the common law and independently of statute, this contract is contrary to public policy and illegal. One who is entrusted with the business of others will not be allowed to make out of the same a pecuniary profit to himself. This doctrine is based upon principles of reason, morality, and public policy. No public agent shall have the opportunity or be led into the temptation to make profit out of the public business entrusted to his care, by contracting with himself, directly or indirectly, in respect to such business. *Mayor &c. of Macon* v. *Huff,* 60 *Ga.* 221; *Hardy* v. *Gainesville,* 121 *Ga.* 327 (48 S. E. 921) ; *Byrd* v. *Cook,* 146 *Ga.* 657 (92 S. E. 61) ; *Twiggs* v. *Wingfield,* 147 *Ga.* 790 (95 S. E. 711, L. R. A. 1918E, 757) ; *Turner* v. *Atlanta,* 160 *Ga.* 216 (127 S. E. 652) ;

Burkett v. Athens, Tenn. Ch. App., 59 S. W. 667. It does not alter the case that Inman did not vote for the ordinances relating to the laying of this pavement, and that he did not use his influence to induce other members of the general council to vote therefor. The fact that he did not take any part in securing this contract for his corporation does not change the situation. The City of Atlanta and its citizens were entitled to have this councilman exercise his administrative and executive ability in securing the best contract that could be had for the laying of this pavement, and to see that the pavement came up to the plans and specifications under which it was laid, and that the terms of the contract were faithfully performed. This he could not do if he were a party at interest under the contract. Inaction on the part of the councilman in this respect amounted to a violation of his duty to the public. Ensley v. Hollingsworth, 170 Ala. 396 (54 So. 95, Ann. Cas. 1912D, 652); Bay v. Davidson, 133 Iowa, 688 (111 N. W. 25, 9 L. R. A. (N. S.) 1014, 119 Am. St. R. 650). This principle applies, although the contract is fair and free from fraud. Public policy will not uphold it. Macon v. Huff, supra. The contract will not be upheld by reason of the fact that the public has received a benefit thereunder. Horkan v. City of Moultrie, 136 Ga. 561 (2) (71 S. E. 785). It is insisted that Inman resigned from the city council, that the city council thereafter by ordinance ratified and confirmed all that had been done by it in making the contract with the construction company for the laying of this pavement and the acceptance of the work of the city after the paving had been completed, and that for this reason the contract between the city and the construction company had been ratified and confirmed, thus relieving the contract of its illegality and criminality. A contract malum in se or against public policy, or which is made illegal or criminal by statute, can not be made valid by ratification; and especially can this not be done by the same council which entered into the illegal and criminal contract. Macon v. Huff, supra; Dorsett v. Garrard, 85 Ga. 734 (11 S. E. 768); Hardy v. Gainesville, supra; Horkan v. Moultrie, supra; 13 C. J. 506, § 452 b.

But, independently of this common-law principle, this contract is illegal under the charter of the City of Atlanta. Section 100 of that charter declares that "It shall not be lawful for any member

of the general council to be interested, either directly or indirectly, in any contract with the City of Atlanta, the mayor and general council, or any one or more of them, having for its object the public improvement of the city, or any part thereof, or the expenditures of its moneys. Any violation of this section by any member of the general council shall, on conviction thereof, be punished· as prescribed in section 4310 of the Code of this State," being section 1065 of the Penal Code of 1910. Ga. L. 1874, p. 120, § 18. But it is insisted that this section of the charter should be construed in connection with section 709 of the Code of 1895, now embraced in section 855 (aa) of Park's Code; and that, so construing it, section 100 of the charter of Atlanta only applies to contracts for the performance of work which is to be paid for out of the treasury, · and that inasmuch as payment for this pavement is not to be paid for out of the treasury of the city but from assessments against owners of property abutting upon this street, said section of the charter is not applicable to the facts of this case. We do not think that this contention is well founded. The section of the charter of the city is broader than the section of the Code. Contracts which come within the provisions of the last-mentioned section are those for the performance of work for which payment is to be made out of the city treasury. By the above section of the charter of the city it is made unlawful for any member of the general council to be interested, either directly or indirectly, in any contract with the City of Atlanta, the mayor and general council, or any one or more of them, having for its object the public improvement of the city, or the expenditures of its moneys. This is a wholesome statute, and it should not be emasculated by judicial construction. Under this charter provision the contract for this pavement between the city and the construction company is illegal by reason of the fact that a large stockholder of the construction company was a member of the city council at the time the contract was entered into. In view of this fact, no action would lie thereon in favor of the construction company against the city.

3. In *Sanders v. Gainesville,* 141 *Ga.* 441 (81 S. E. 215), this court held that "If a contract for the construction of a public improvement has been let, and an assessment levied to pay such contract price, the validity of such contract is essential to the validity of the assessment; since otherwise the assessment would be levied

to pay a claim not legally due against the city." ·A feature of the present case is different from that of the case cited. In the case cited the city would have been liable for a portion of the cost of the pavement, if the contract had been valid. In the instant case the city is not liable for any part of the cost of the payment; but the entire cost thereof would have to be borne by owners of abutting property and the street-railway company. We do not think that this distinguishing feature of the present case alters the principle announced in the case cited. So we are of the opinion that, to make valid an assessment against the owners of property abutting upon a street which is paved under the act of 1919, there must be a valid contract between the city and the contractor. If there is no such valid contract, the assessment is invalid and unenforceable against the property-owners. It follows from our ruling that the contract for this pavement is invalid, that the assessment is invalid. Neither a court of law nor a court of equity will assist a party in whose favor such assessment is levied to enforce the same.

4. While we hold that the contract under which this pavement was laid, and the assessment levied for the payment of the costs of this improvement, are· invalid and void, are the plaintiffs ·entitled to the relief sought under the facts of this case? They are in a court of equity. They are seeking affirmative equitable relief. They are seeking to have said contract and assessment declared illegal and void. They are seeking to restrain the City of Atlanta from carrying on proceedings to validate a proposed issue of bonds for the payment of the cost of said improvement, and from selling and disposing of the same; and they are seeking to enjoin the construction company from taking any legal proceedings, or other steps of any character whatsoever, to enforce the collection of its claim against the City of Atlanta for such payment, from undertaking to procure an assessment by the city against the property-owners for the work done under this contract, and from altering the status between the construction company and the city and the property-owners. They are not defensively setting up the invalidity of this contract and this assessment. The relief which the plaintiffs seek is equitable relief. *Campbell* v. *Murray*, 62 *Ga.* 86, 96. They are seeking the writ of injunction. They thus ask for extraordinary equitable relief. "He who would have equity must

do equity, and give effect to all equitable rights in the other party respecting the subject-matter of the suit." Civil Code (1910), § 4521. This principle is applicable where one in an equity suit seeks both legal and equitable relief. One who avails himself of a remedy in a court of equity is as much bound by this principle as one who is asserting in such a court a purely equitable right. *C. & W. C. Ry. Co.* v. *Hughes,* 105 *Ga.* 1 (3) (30 S. E. 972, 70 Am. St. R. 17). In *Frick* v. *Moore,* 82 *Ga.* 159 (8 S. E. 80), the plaintiff filed her bill to enjoin the defendants from disposing of certain notes which she alleged she had given to them for the purpose of suppressing a criminal prosecution against her son for larceny after trust; and she asked that these notes be surrendered and cancelled. Compounding such a crime is itself a felony. Penal Code (1910), § 328. This court held, that, while such a crime is forbidden by the law, the plaintiff, who had received from the defendants a certain account and notes under the agreement, must have tendered to the defendants the same before she could have the equitable relief sought. In this case the agreement was both illegal and criminal; and yet this court applied the principle with which we are now dealing. In *Macon* v. *Huff,* supra, this court was dealing with a contract made between the City of Macon and its mayor, which a majority of the aldermen of the city brought a bill to annul and set aside. This court held: "Equity, however, requires every litigant who seeks her aid to do equity; and inasmuch as the defendant has expended large sums of money in fencing, leveling, draining, and ornamenting the park, of which the city has received the benefit, equity will not interpose in behalf of the claimant to annul and set aside the contract, though thus illegal, unless the complainant shall first do equity, and to do equity the city must pay the defendant the money so expended and interest thereon, and thus restore him, as far as practicable, to his status quo, in the absence of actual fraud on his part." The only difference between the case cited and the one at bar is, in the former case the contract was prohibited by law but not made criminal, while the contract in this case is both prohibited and penalized. This difference does not make the ruling in the case cited inapplicable to the case which we have under consideration. Many of the plaintiffs in this case petitioned to have this street improvement made, and all of them knew, or by the exercise of

ordinary diligence could have known of the existence of the facts which render this ordinance and contract invalid, and could have taken legal proceedings to prevent the performance of the contract and the expenditure of a large sum of money thereunder in making these improvements. In these circumstances it would be inequitable to permit them to enjoin the city and the construction company from enforcing the assessment levied upon their property for the purpose of paying for this improvement, and thus saddle upon the construction company the loss of a large sum expended by it in doing this work. Seeking equitable relief in the premises, they must do equity. They must pay for the benefits which they are receiving from this improvement, before they can have the contract under which it was made and the assessment levied to defray the cost of the work declared null and void.

5. In the contract between the city and the construction company, the city agreed to issue bonds to cover the total cost of this street improvement, and thereupon to promptly dispose of these bonds and pay the contractor such sum as might be due it for the paving of this street. These bonds were to be issued under the provision of the constitution which permits the city to issue bonds for street improvements without the approval of a popular vote. Acts 1920, p. 25. The legislature has provided the terms and conditions upon which this right can be exercised. Acts 1921, p. 212. The trial judge enjoined the city from paying to the contractor any money other than that received from the property-owners, and from paying the contractor any money from its public treasury. To this portion of the judgment the city and contractor except. The city was permitted to file proceedings to validate the bonds proposed to be issued by the city in order to raise the money with which to pay for this street improvement; but the trial judge in his judgment enjoined the hearing of the proceedings to validate these bonds, pending the final decision of this case, to which order the defendants except. The court did not err in holding that the contract between the city and the construction company was invalid, and did not err in holding that the same had not been legally ratified and adopted by the city council after Inman had resigned as a member thereof. But in view of the principle announced in dealing with the assignments of error complained of in the main bill of exceptions, that parties

who seek equity must do equity, the court erred in enjoining the city, at the instance of the plaintiffs, in the respects complained of in the cross-bill of exceptions. Nothing herein ruled shall be held to preclude the plaintiffs or others from setting up any legal defenses which they may have to the validation of said bonds.

*Judgment on the main bill of exceptions affirmed, and on the cross-bill of exceptions reversed.  All the Justices concur, except Atkinson and Hill, JJ., disqualified.*

GILBERT, J.  I concur in the judgment rendered in this case, but dissent from some of the conclusions stated in the opinion. In regard to the jurisdictional question dealt with in the first headnote and corresponding division of the opinion, I think the right conclusion is reached.  Moreover, even if the petitioners are not estopped from attacking the jurisdiction on the ground stated, it seems to me that their attack is without merit.  I also concur in the ruling made in the fourth and fifth headnotes and corresponding divisions of the opinion.  The above-stated rulings control the case, and it seems to me unnecessary to consider the other questions raised.  Since, however, the majority of the court have thought best to consider and decide them and have reached conclusions in which I can not concur, my dissent must be recorded.

Of course, section 18 of the charter of the City of Atlanta prevents and makes unlawful the making of any contract with the city by any member of council who is interested either directly or indirectly.  This is a wholesome and necessary law.  The same comment applies to Civil Code, §§ 855 (aa) and 900.  These provisions are quoted by the court.  But it must be remembered, in the first place, that the paving provided for in the contract was not to be paid for out of the city treasury but by the abutting-property owners; and in the second place, that the city had the undoubted legal right to contract for the paving.  It is clear from the facts in the case that the project of having Ponce de Leon Avenue repaved was due to the initiative of the property-owners. They filed a petition with the mayor and council, asking that the avenue be paved.  On November 5, 1924, the council published in one of the Atlanta newspapers a notice that an ordinance by the mayor and general council, providing for the pavement, would be considered on November 17, 1924, and that property-owners and others interested were notified to appear at that time and

file any objections they might have. On November 17, 1924, the time stated in the notice, there being no objection to the same, the ordinance was passed by the council, and on November 20 it was concurred in by the aldermanic board, and on November 21 it was approved by the mayor. In a separate action, on recommenda-.tion of the special committee of city council that the bid of the MacDougald Construction Company be accepted, the pavement was ordered by the city council and the aldermanic board, and approved by the mayor. The ordinance providing for the paving of the street was independent of the ordinance accepting the Mac-Dougald Construction Company's bid. There is, as I understand, no attack on the ordinance providing for the paving, for all the petitioners desired the adoption of that ordinance and urged the completion of the pavement. The council passed a resolution call-ing for bids. In this the city council was merely carrying out the expressed wishes of the property-owners. When that resolution was passed no contract had been made. The time had not ar-rived for the making of the contract, nor had the time arrived for the reception of the bids; consequently no sort of shadow is cast upon the resolution itself. It was valid and legal. Subsequently, when the bids were received, the matter of canvassing the bids in order to make a recommendation to council as to the award, the disqualified member of council was not one of that committee; consequently no shadow of illegality pertains to the action of the committee. It was found by the committee that the MacDougald Construction Company was the lowest and best bidder. That bid was recommended for acceptance. The finding of the committee in this respect has not been questioned. Therefore we proceed upon the theory that the paving was done at the express wishes of the property-owners, that the ordinance looking to the paving was valid and legal, that the action of the committee was without flaw, and that the lowest and best bidder received the contract.

At this point we encounter the question of one of the members of council being disqualified because of interest in the construc-tion company. No moral wrong has been charged to him; he did not vote nor did he participate in any way in awarding the contract. The council of which he was a member did award the contract to a corporation in which he was interested. This act was contrary to public policy, and is so declared in our code and

the charter of the City of Atlanta, and by right should be against public policy; but because a thing is against public policy does not mean that the municipality, when the disqualified member has resigned, may not of its own volition act as its sense of right and justice dictates. Acting upon this principle, the mayor and city council elected to do what in their judgment was right and within their legal power to do. The ordinance calling for bids being valid and the paving having been completed by the lowest and best bidder, and the proper municipal officer having approved the same, the mayor and council deemed it just and proper to pay to the construction company the reasonable worth of its labor and material furnished. The ineligible and disqualified member of council having resigned, the municipality passed a new ordinance ratifying and renewing their obligation to pay the construction company. There is no reason in law why they could not ratify the contract, and no reason in morals why they should not. *Mayor &c. of Macon* v. *Huff,* 60 *Ga.* 221, 230. In *Hardy* v. *Gainesville,* 121 *Ga.* 327 (supra), the mayor and council awarded a contract for printing to a publishing company. One member of the city council at that time owned stock in said publishing company. After making the contract this member of council disposed of his stock in the publishing company. Subsequently a citizen and taxpayer sought to restrain the municipality from carrying out the contract. This court held that the contract was null and void, and that the subsequent disposal of the stock in the publishing company did not make the contract valid. The decision was sound. The member of council who owned stock in the publishing company at the time the contract was made continued to be a member of council, and the contract made while he was a member of council was sought to be enforced and executed by the municipality; but there was no resignation from council of the ineligible and disqualified member, and no ratifying ordinance passed after such resignation. This court said, in that case: "The contract having been illegal and void at the time of its execution, it could not become legalized by the subsequent transfer of the stock of the publishing company. *If the officer of the city then ceased to have any interest in the publishing company's business and contracts, we see no reason why such company and the city could not have entered into a new contract; but we are clear that they could not*

*properly treat the old illegal contract as having become valid by reason of the transfer of the stock."* [Emphasis mine.]

Here the court said that even with the disqualified member of council remaining a member, if he had transferred his interest in the publishing company, the city council, composed exactly as it was when the contract was made, could have entered into a new contract. In this case the disqualified member resigned and was no longer a member of council. His influence and interest were entirely removed so far as his severance from the municipal governing body could accomplish that end. After his resignation, there is no valid reason why the city council could not ratify a contract already made at the request of the property-owners, and thus do the equitable thing. The court was authorized, under the evidence, to find that the paving was laid in accordance with the city's specifications, and that it had been approved by the officer employed by the City of Atlanta to direct and inspect such work. For these reasons, in my opinion, the trial court did not err in the judgment there rendered.

It would be inappropriate to extend this discussion by setting out, in detail, the views of other courts. I content myself with citing the following cases, which contain, in themselves, many other citations: Fort Wayne *v.* Lake Shore Ry., 18 L. R. A. 367 (132 Ind. 558, 32 N. E. 215, 32 Am. St. R. 277) ; City of Findlay *v.* Pertz, 66 Fed. 427 (2) (13 C. C. A. 559, 29 L. R. A. 188). The opinion in this case was written by Judge Lurton, afterwards a Justice of the Supreme Court, and concurred in by Judge Taft, at present Chief Justice of the United States. City of Detroit *v.* Grummond, 216 Fed. 273 (132 C. C. A. 417) ; Hill *v.* Indianapolis, 92 Fed. 467; Diver *v.* Keokuk Savings Bank, 126 Iowa, 691 (102 N. W. 542, 3 Ann. Cas. 669) ; Kagy *v.* Independent Dist., 117 Iowa, 694 (89 N. W. 972) ; Ballentine *v.* City of Columbia, 129 S. C. 410 (124 S. E. 643).