42126. DEPARTMENT OF TRANSPORTATION et al.
v. BROOKS et al.
42127. SHEPHERD CONSTRUCTION COMPANY, INC. et al.
v. BROOKS et al.
42191. BROOKS et al. v. CITY OF ATLANTA et al.
(328 SE2d 705)

PER CURIAM.[1]

The plaintiffs, as residents, citizens, and taxpayers of the City of Atlanta and State of Georgia, brought this suit to enjoin performance under a contract entered into between Shepherd Construction Company and the Department of Transportation for the grading and paving of a road known as the Presidential Parkway. In addition, the plaintiffs seek to have declared null and void a vote of the Atlanta City Council enacting an ordinance transferring properties to the Department of Transportation (referred to hereinafter as the DOT) to be used as rights-of-way for the parkway. The trial court granted the plaintiffs' motion for a temporary restraining order. The court subsequently entered an order granting the plaintiffs' request to set aside the grading and paving contract (referred to hereinafter as the Shepherd/DOT contract) but denying their request to overturn the ordinance (referred to hereinafter as the land-transfer ordinance). In Case No. 42126, the DOT appeals the trial court's ruling as to the Shepherd/DOT contract. In Case No. 42127, Shepherd Construction Company (referred to hereinafter as Shepherd) appeals the same ruling. In Case No. 42191, the plaintiffs appeal the trial court's ruling as to the land-transfer ordinance. We granted the DOT's motion for an ex-

---

[1] Marshall, P. J., prepared the opinion on behalf of the Court, with the exception of that portion styled "Our Holdings in Case No. 42191," which was prepared on behalf of the Court by Weltner, J.

pedited appeal.

*Facts*

(a) Shepherd/DOT contract:

Law enforcement investigations in Georgia and other states uncovered massive conspiracies by contractors to rig the bids on highway construction projects. As a result, approximately 50 contractors in Georgia and other states were convicted on bid-rigging conspiracy charges.

On March 31, 1982, Shepherd entered a plea of guilty to charges of conspiracy and restraint of free and open competition, i.e., bid rigging, in criminal proceedings in the Fulton Superior Court. See OCGA § 16-10-22 (a).[2] Shepherd was placed on one year's criminal probation and, as part of its sentence, was ordered to pay restitution to the DOT in the amount of $2,225,000, in four equal installments of principal plus interest on the unpaid balance at the rate of 12% per annum. In addition, Shepherd was ordered to execute a promissory note, with a security agreement to secure the unpaid balance of the restitution.

Shepherd executed the promissory note and security agreement. Its first installment payment of restitution was due on the date of sentencing and was paid on that date. Its second installment was due in April of 1983, and it was paid six months early. Its third installment payment was due in April of 1984, and it was not paid when due. The circumstances surrounding Shepherd's failure to pay the third installment when due will be discussed more fully later in the opinion. The fourth installment was due in April of 1985, and it was paid two months early.

On April 2, 1982, two days after Shepherd pleaded guilty, the DOT suspended Shepherd's Certificate of Qualification to bid on DOT projects.[3] However, this suspension did not vitiate existing contracts previously awarded to Shepherd.

On January 19, 1983, the DOT and Shepherd entered into a Probationary Agreement. Under this agreement, the DOT agreed to restore Shepherd's Certificate of Qualification on a probationary basis, conditioned upon Shepherd's continuing compliance with the terms of the agreement. This Probationary Agreement was created by the DOT so that the DOT could let contracts to contractors implicated in

---

[2] On June 23, 1982, Shepherd pleaded guilty in United States District Court to a charge of violating the Sherman Antitrust Act by conspiring to suppress and eliminate competition with respect to federal highway projects. 15 USCA § 1.

[3] OCGA § 32-2-66 authorizes the DOT to maintain "a list of reliable persons qualified to bid on a [DOT] contract . . ."

bid-rigging activities; but, at the same time, the Probationary Agreements give the DOT contractual rights to prevent the contractors from engaging in anti-competitive activities. Under the Probationary Agreement, Shepherd was required to keep records of contacts with suppliers of material and subcontractors, as well as records on all successful and unsuccessful bids submitted on DOT construction projects. The Probationary Agreement does not address the matter of restitution.

On or about November 13, 1983, Shepherd became eligible to bid on federal-aid projects because its debarment by the United States was lifted at that time.

In the summer of 1984, the DOT conducted an audit of the bidding records of Shepherd in order to check Shepherd's compliance with the record-keeping requirements of the Probationary Agreement. This audit disclosed the fact that Shepherd in 1983 had not retained records on at least 17 projects for which it was not the low bidder. It was also discovered that in certain instances Shepherd had failed to keep records of the date and person contacted on quotes from suppliers of material and subcontractors. The DOT determined that the foregoing violations of the Probationary Agreement were not material violations, and a decision was made merely to warn Shepherd that strict compliance with the Probationary Agreement would be required in the future.

On October 4, 1984, the Presidential Parkway began to be advertised for bids. On October 24, 1984, Harold Shepherd, President of Shepherd Construction Company, telephoned Jack Newhard, President of APAC-Georgia.[4] According to Newhard, Shepherd asked him: ". . . if we were interested in [the] Presidential Parkway. I said that we were looking at it and that was all I could say. He said OK. He said we hadn't said anything wrong and that was all." Although a record of this conversation was kept by Mr. Newhard, Mr. Shepherd made no such record. Shepherd's failure to make a record of the conversation was a violation of the Probationary Agreement; however, the DOT did not become aware of this violation until February of 1985.

Meanwhile, on October 26, 1984, bids were received on the Presidential Parkway project. On the grading and paving portion of the project, Shepherd's bid of $15,491,000.76 was the lowest bid. APAC-Georgia made the next lowest bid, which was $1,380,000 higher than Shepherd's bid. Consequently, Shepherd was announced as the apparent low bidder on the grading and paving contract. In addition, Arapaho Construction, Inc., was announced as the apparent low bid-

---

[4] APAC-Georgia was previously the Ashland-Warren Company.

der on the contract for construction of the Presidential Parkway bridges. Arapaho's bid was $6,526,925. On November 21, 1984, Shepherd was awarded the grading and paving contract, and Arapaho was awarded the contract for construction of the bridges. Work commenced on the project on December 6, 1984.

On January 7, 1985, the DOT discovered that Shepherd had not made the restitution installment payment due in April of 1984. The DOT called Shepherd and demanded payment. On January 8, 1985, Shepherd paid the $562,500 principal amount of the installment plus $308,000 interest. Because the installment payment was promptly paid following the demand, the DOT took no further action against Shepherd as a result of the late payment. In addition, Shepherd's debt to the DOT was fully secured, and the interest ultimately paid by Shepherd on its third installment exceeded the interest the DOT would have earned if the funds had been paid when due and invested in state depositories.

On February 13, 1985, the DOT discovered that Harold Shepherd had failed to make a record of his October 24 telephone conversation with Jack Newhard. When questioned by an agent of the DOT, Mr. Shepherd stated that the purpose of the conversation was to ask Mr. Newhard if he was going to bid the project, and that Mr. Newhard told him that APAC was going to bid it. On February 19, 1985, Shepherd's Certificate of Qualification was suspended pending a hearing before the DOT's Prequalification Committee. On February 27, 1985, the Prequalification Committee revoked Shepherd's Certificate of Qualification because of Shepherd's failure to keep a record of the conversation with Newhard after being warned that strict compliance with the record-keeping provisions of the Probationary Agreement would be required.

After a consideration of the matter, the State Transportation Board decided, for the following reasons, not to rescind Shepherd's contract for the paving and grading of the Presidential Parkway: (1) It would add more than $2 million to the cost of the project to remove Shepherd, re-let the project, and obtain a new contractor. (2) To cancel the contract would throw the DOT's entire contracting process into chaos, because Shepherd has 32 other DOT contracts by itself and 12 joint projects. (3) The bridge contractor, Arapaho, has mobilized forces and has gone to work relying upon a construction schedule with Shepherd. (4) A delay on this project at this time of year precludes use of the most valuable construction weather; and there would be a substantial delay if the project had to be re-advertised, re-bid, and re-awarded. (5) The DOT does not have a problem with Shepherd's doing quality construction work in a timely fashion; according to the DOT, Shepherd is "one of the best contractors we have as far as getting the work done and the quality of the work." (6) Perhaps

the most critical factor, according to the DOT, is the fact that the DOT concluded, after an extensive investigation, that the contract price was arrived at by free and open competition, i.e., there was no bid rigging on this contract.

(b) Land-transfer ordinance:

Arrington Enterprises, Inc., was listed as a DBE subcontractor on the bid submitted by Shepherd for the grading and paving of the Presidential Parkway. DBE stands for "Disadvantaged Business Enterprise." Federal law requires that DBEs receive certain percentages of federally funded projects.

Arrington Enterprises was formed when Plant Improvement Company, owned by the Shepherds, asked City Council President Marvin Arrington to participate in a joint venture program, whereby Arrington would own 51% of a construction hauling corporation and Shepherd would own the remaining 49%. Such an arrangement would thereby assure Shepherd Construction Company of an available, qualified minority subcontractor in accordance with the requirements of the DBE program. As a result of these negotiations, Arrington Enterprises, Inc. was incorporated on April 27, 1984. Marvin Arrington, Stephen Shepherd, and James Shepherd were included in the initial board of directors.

In May 1984, by letter addressed to Marvin Arrington from the DOT, Arrington Enterprises was certified conditionally as a qualified DBE. This certification was withdrawn on July 24, 1984. Later, both Marvin Arrington and Stephen Shepherd (Vice-President of Plant Improvement Company) wrote lengthy letters to Commissioner Moreland, urging recertification. On August 15, 1984, the DOT, once again, granted conditional certification as a DBE to Arringon Enterprises.

On October 26, 1984, the DOT announced Shepherd Constuction Company as the low bidder on the Presidential Parkway contract. Arrington Enteprises was listed as the DBE hauling subcontractor. The subcontract between Arrington Enterprises and Shepherd Construction Company was in the amount of $891,055.

On November 19, 1984, 24 days after Shepherd was announced as the apparent low bidder, Arrington, as City Council President, presided over a meeting of the Atlanta City Council. At this meeting, the Council considered and voted upon an ordinance transferring parklands owned by the city to the DOT for rights-of-way for the Presidential Parkway, in return for property to be transferred by the DOT to the city for the reconstruction of Candler Park Golf Course.

This ordinance received nine favorable votes, eight negative votes, one council member not voting, and Council President Arrington abstaining. Council President Arrington announced the ordinance as having passed.

However, the ordinance should not have been announced as hav-

ing passed, in view of the fact that § 2-302 of the Charter of the City of Atlanta generally requires the vote of a majority of council members for passage of ordinances.[5]

And, as previously stated, Arrington Enterprises, Inc., was listed as a subcontractor on the bid Shepherd submitted to the DOT for the Presidential Parkway project. As a result, Council President Arrington's presiding over the council meeting while the land-transfer ordinance was being decided constituted a violation of § 18-2004 of the Atlanta Code of Ordinances. Section 18-2004 provides that any council member who has a "private interest, direct or indirect" in any legislation or decision pending before the council "shall not vote for or against, discuss, decide or in any way participate in considering the matter, but shall publicly disclose, on the official records of the body, the nature and extent of such interest, prior to any determination of the matter." However, § 18-2004 goes on to provide that, "the failure of any person to comply with requirements of this section and the failure of any person to refrain from participating in debate or voting on any matter will not affect the validity of any action taken by the city council."[6]

After other matters had been taken up during the November 19 council meeting, it was brought to the council's attention that the land-transfer ordinance had not received a majority vote and would have to be revoted. Council Member Ira Jackson, who introduced the ordinance, stated, "I suppose instead of revoting, you just have to declare the vote a different way. And the motion fails, is all I know. That is all I know. You have got to have a majority of votes present." In accordance with past practice, Council President Arrington stated that the ordinance could be voted again, and he called for a revote. No objection was made. While the deputy clerk was announcing that the voting machines were open, Council Member John Lewis asked a

---

[5] Section 2-302 of the Charter of the City of Atlanta provides in full, "The vote of a majority of the council members *present* shall be required for passage of ordinances and resolutions except as otherwise provided by law." (Emphasis supplied.)

There are 18 members of the Atlanta City Council. At the November 19 meeting, all council members were present. In addition, in 1982 the charter of the City of Atlanta was amended so as to give the council president the right to vote on any issue or question before the council at any regular or called meeting. Ga. L. 1982, pp. 3595-3596, § 1. Therefore, the land-transfer ordinance required 10 votes for its passage.

[6] Section 18-2004 provides, in full, "The mayor, the president of council, any council member, official or employee of the city who has a private interest, direct or indirect, in any proposed legislation or any decision pending before such person or the body of which the person is a member or employee, shall not vote for or against, discuss, decide or in any way participate in considering the matter, but shall disclose, on the official records of the body, the nature and extent of such interest, prior to any determination of the matter. The failure of any person to comply with requirements of this section and the failure of any person to refrain from participating in debate or voting on any matter will not affect the validity of any action taken by the city council."

question. On the second vote, the ordinance received 11 favorable votes and eight unfavorable votes, with Council President Arrington casting a favorable vote. The ordinance was announced as having passed by an 11-to-8 vote. Council President Arrington subsequently changed his affirmative vote to an abstention, stating that he had voted inadvertently in the confusion while attempting to turn on Council Member Lewis' microphone and respond to his question. The trial court found that the videotape of the council meeting supports Council President Arrington's contention that he mistakenly cast his vote during the confusion of the meeting. As to an ordinance authorizing the sale of public property of the city, § 2-402 (c) of the Charter of the City of Atlanta provides that a member of the council "may" give notice of a motion to reconsider the vote on such ordinance. Section 2-402 (c) further provides that the notice "shall operate to delay the question until such motion can be acted upon at the next regular or special meeting."[7]

On November 19, 1984, the land-transfer ordinance was certified as having passed by a 10-to-8 vote. On November 21, 1984, after having received the certified ordinance from the Atlanta City Council, Mayor Andrew Young executed a contract for exchange of the properties with the DOT. Mayor Young also executed a deed conveying the parklands to the DOT. The deed, and a certified copy of the ordinance authorizing the conveyance, were delivered to the DOT. In exchange, DOT Commissioner Tom Moreland executed and delivered to the city a quitclaim deed transferring to the city the property to be used for reconstruction of Candler Park Golf Course.

From the record, it appears that the fact that Arrington Enterprises was a DBE subcontractor on the Presidential Parkway project was first publicized on WGST radio on December 18, 1984. Commissioner Moreland requested that the Attorney General of Georgia conduct an investigation. On January 15, 1985, the results of the investigation were released, which concluded that Arrington's participation in the Presidential Parkway project constituted a conflict of interest. Arrington Enterprises then withdrew as a DBE subcontractor on the project.

The plaintiffs filed the present complaint on January 25, 1985.

---

[7] Section 2-402 (c) provides in full, "Any one (1) member of the council may give notice of a motion to reconsider any vote, resolution or ordinance having for its object the increase of the indebtedness of the city, or the expenditure of its monies, or authorizing the sale of any part of the public property of the city, or the granting of any franchise where the streets or public alleys are to be used for any purpose in the prosecution of the business of the applicant seeking the franchise, which notice shall operate to delay the question until such motion can be acted upon at the next regular or special meeting."

## Trial Court's Rulings

(a) As to the validity of the Shepherd/DOT contract, the trial court ruled as follows:

The court recognizes that the judicial branch of government should not intrude upon the decison-making powers of the executive branch, and the court further rules that it should not substitute its judgment for that of the DOT "except for compelling reasons."

The court acknowledges that the need for, or the desirability of, the Presidential Parkway is not an issue in this case. However, the court determines that since, at the time the Shepherd/DOT contract was entered into, Shepherd was in violation of the record-keeping provisions of the Probationary Agreement, as well as in default in making the third installment of its court-ordered restitution, there are "compelling reasons" for the court to void the Shepherd/DOT contract. In so holding, the court rules that the DOT, in the exercise of ordinary care, should have been aware of the nonpayment of restitution at the time the contract was awarded to Shepherd; that Shepherd had wrongfully withheld public funds for a period of 287 days; and the fact that the state would have earned less interest on the funds if the money had been paid when due is "totally irrelevant." Although, as found by the court below, there is no evidence of bid rigging on the Presidential Parkway project, the court concluded that, even though the DOT was acting in good faith, it abused its discretion in allowing Shepherd to continue performance under the Shepherd/DOT contract once the foregoing violations were discovered. In this regard, the court found the opinion of the DOT, that Shepherd is a trustworthy contractor even if it is not a trustworthy bidder, to be too "fine [a] distinction." Ultimately, the court concluded that the economic factors do not outweigh the fact that it would be against public policy to allow Shepherd to continue on the contract.

In this latter regard, the court noted that, "the integrity of the system must be preserved in spite of costs . . . The practices, whether it be policy or not, in this particular case leave the door open to arbitrariness and capriciousness in the decision-making process. Such practices, where a department of government is involved, generate problems in the minds of the members of the public as well as diminishing confidence, which is not in the public good. The public is entitled to know just what criteria are applied in making judgment on qualified or unqualified bidders. Thus, certain classes of acts are said to be 'against public policy,' when the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interests of the state, apart from illegality or immorality. On these issues, a question arises: Do the ends justify the means? The answer must be in the negative if the integrity of the

system is to be preserved. Based upon the aforesaid findings of fact, the Department of Transportation should not have entered into the contract of November 21, 1984, and the court further finds the continuing performance of Shepherd under the contract is against public policy."

(b) As to the land-transfer ordinance, the superior court found as follows:

The court ruled that since the deed executed by the city and the certified copy of the land-transfer ordinance were valid "on its face," the DOT had a right to rely upon these documents. The superior court found that in justified reliance on these documents, "the DOT has entered into the contract with the City of Atlanta, has executed and delivered a deed transferring property to the City of Atlanta, has entered contracts with Shepherd and Arapaho, has expended money for the purchase of additional rights-of-way, has begun construction, has begun extensive clearing and grading, and has expended substantial sums." The superior court concluded that under these circumstances, the plaintiffs cannot now come into a court of equity and challenge the validity of the land-transfer ordinance.

## Our Holdings in Case Nos. 42126 and 42127

1. The trial court's ordering of a rescission of the Shepherd/DOT contract on public-policy grounds is inconsistent with the following statutory provisions and judicial pronouncements on the subject.

OCGA Title 13, Ch. 8, contains the statutory provisions on the subject of contracts which are void as violative of public policy. OCGA § 13-8-1 provides, "A contract to do an immoral or illegal thing is void. If the contract is severable, however, the part of the contract which is legal will not be invalidated by the part of the contract which is illegal." OCGA § 13-8-2 (a) provides, "A contract which is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to: (1) Contracts tending to corrupt legislation or the judiciary; (2) Contracts in general restraint of trade; (3) Contracts to evade or oppose the revenue laws of another country; (4) Wagering contracts; (5) Contracts of maintenance or champerty."[8]

---

[8] OCGA § 13-8-2 (b) provides, "A covenant, promise, agreement, or understanding in or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair, or maintenance of a building, structure, appurtenances, and appliances, including moving, demolition, and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee is against public policy and is void and unenfoceable, provided that this subsection shall not affect the validity of any insurance contract, workers'

"Public policy" is an amorphous concept; thus, "[p]roblems have arisen here, as elsewhere, in ascertaining the authoritative sources of public policy and in channeling the discretion of the trial judge." 4 Ga. L. Rev. 469, 480, The Unconscionability Offense (1970). (Footnote omitted.) Accordingly, it has been held that, "the delicate and undefined power of courts to declare a contract void as contravening public policy should be exercised with great caution, and only in cases free from substantial doubt . . ." *Foster v. Allen*, 201 Ga. 348, 349 (40 SE2d 57) (1946); *McClelland v. Alexander*, 117 Ga. App. 663 (2) (161 SE2d 397) (1968).

Basic criteria have been set down for the determination of whether a contract is void as against public policy. "A contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is contrary to good morals and contrary to law, or unless the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of law. *Camp v. Aetna Ins. Co.*, 170 Ga. 46, 50 (152 SE 41) (1929); *Brown v. Five Points Parking Ctr.*, [121 Ga. App. 819, 821 (175 SE2d 901) (1970)]." *Porubiansky v. Emory University*, 156 Ga. App. 602, 603 (275 SE2d 163) (1980), aff'd sub nom. *Emory University v. Porubiansky*, 248 Ga. 391 (282 SE2d 903) (1981). Accord *Williams v. Cox Enterprises,* 159 Ga. App. 333 (1) (283 SE2d 367) (1981). But see *Strickland v. Gulf Life Ins. Co.*, 240 Ga. 723 (242 SE2d 148) (1978).[9]

The idea that the consideration for the contract, or purpose of the contract, must be immoral or illegal in order for the contract to be void on public-policy grounds finds expression in cases holding that the contract is not rendered void by some illegality which is collateral to, or only remotely connected with, the contract. See, e.g., *Sewell v. Norris*, 128 Ga. 824 (58 SE 637) (1907); *Shannondoah, Inc. v. Smith*, 140 Ga. App. 200 (230 SE2d 351) (1976).

At least part of the reason that the courts will not enforce illegal or immoral contracts is that by doing so the judiciary would be facilitating the illegality or immorality. In line with the foregoing precept, the rule still obtains that although an illegal contract which is execu-

---

compensation, or agreement issued by an admitted insurer." See *Country Club Apts. v. Scott*, 154 Ga. App. 217 (267 SE2d 811) (1980), aff'd *Country Club Apts. v. Scott*, 246 Ga. 443 (271 SE2d 841) (1980).

[9] In *Strickland v. Gulf Life Ins. Co.*, it was held that the trial court should not have granted summary judgment in favor of the defendant-insurance company where the question for decision concerned the enforceability of a clause in an insurance policy providing coverage for the loss of a leg only if the leg was severed within 90 days of the injury. *Strickland* cited cases from other jurisdictions adopting the minority view that such a clause is void as againt public policy. *Strickland* should not be read as authority for the proposition that a judge, in his untrammeled discretion, may decide what is and is not "public policy."

tory will not be enforced, an illegal contract which has been executed will be left to stand. *Quinton v. Millican,* 196 Ga. 175 (26 SE2d 435) (1943); *Jones v. Faulkner,* 101 Ga. App. 547 (114 SE2d 542) (1960). This rule is also predicated on the idea that both parties to an illegal contract are considered to be in pari delicto. However, when the parties are not in pari delicto, as in the case where one party to an otherwise valid contract has defrauded the other party, the rule here is that the fraud renders the contract, not void, but voidable at the election of the injured party. OCGA § 13-5-5; *Puckett v. Reese,* 203 Ga. 716 (48 SE2d 297) (1948); *Brown v. Ragsdale Motor Co.,* 65 Ga. App. 727 (16 SE2d 176) (1941). In this situation, the injured party has the election either to rescind the contract, or to affirm it and sue for damages. *Puckett v. Reese,* supra; *Brown v. Ragsdale Motor Co.,* supra.

The Shepherd/DOT contract does not have an immoral or illegal consideration, the contract was not entered into for the purpose of effecting an immoral or illegal purpose, and it is not one of the contracts deemed contrary to public policy in § 13-8-2 (a). The Shepherd/DOT contract was not the product of Shepherd's violations of the court-ordered restitution and the record-keeping provisions of the Probationary Agreement. And, Shepherd's qualification as a bidder, as well as contractor, on DOT projects was not conditioned upon compliance with the DOT's Probationary Agreement or the court-ordered restitution-payment schedule. As found by the trial court, the DOT is guilty of no wrongdoing.[10] It is thus the DOT, and not the Fulton Superior Court, which represents the interests of the state in this instance,[11] and the DOT complains of the action of the court in ordering that the Shepherd/DOT contract be rescinded. For these reasons, we conclude that under the legal authorities previously cited, the trial court was not authorized to order the Shepherd/DOT contract rescinded on the ground that it violates public policy.

---

[10] If the Shepherd/DOT contract had been the product of collusion between Shepherd and the DOT, this would be a far different case. If Shepherd had conspired with other contractors to rig the bids on this contract, it would also be a far different case.

[11] OCGA § 32-2-2 (a) (5) empowers the DOT to enter into contracts with "any person" for, among other things, the construction or maintenance of any public road "in such manner and subject to such express limitations as may be provided by law." Section 32-2-60 requires DOT construction contracts to be in writing and to include "as a cost of the project, provisions for sowing vegetation, if appropriate, on all banks, fills, cuts, ditches, and other places where soil erosion is likely to result from the necessary incidents to road work along the right of way of the road project." Sections 32-2-61 (d) (1) and 32-2-64 require the DOT to advertise for public bids, public-road construction and maintenance contracts involving the expenditure of $5,000 or more, with certain exceptions listed in subsections (A) — (D) of § 32-2-61 (d) (1). OCGA § 32-2-69 provides, "The [DOT] shall award the contract to the lowest reliable bidder where at least two or more bids have been received from reliable bidders, provided that the DOT shall have the right to reject any and all such bids whether such right is reserved in the public notice or not and, in such case, the [DOT] may readvertise, perform the work itself, or abandon the project."

2. We cannot sustain the trial court's ruling that the DOT abused its discretion in failing to rescind the Shepherd/DOT contract.

"It has been held that state executive officials exercising functions in which they have discretionary powers cannot be reached by injunction. *Southern Mining Co. v. Lowe*, 105 Ga. 352 (31 SE 191) (1898); *Peeples v. Byrd*, 98 Ga. 688 (25 SE 677) (1896); *Scofield v. Perkerson*, 46 Ga. 325 (1872)." *Evans v. Just Open Government*, 242 Ga. 834, 838 (251 SE2d 546) (1979). (Footnote omitted.) Likewise, the weight of authority favors the rule that a court of equity will not, at the instance of citizens and taxpayers, interfere to restrain or control the discretionary powers of municipal officials, but will only interfere if it appears that the act is ultra vires or fraudulent and corrupt. *Lewis Motor Co. v. Mayor &c. of Savannah*, 210 Ga. 591 (3, 4) (82 SE2d 132) (1954) and cits. Accord *City of Atlanta v. Henry Grady Hotel Corp.*, 220 Ga. 249 (138 SE2d 362) (1964). See also *City of Atlanta v. First Nat. Bank*, 246 Ga. 424 (271 SE2d 821) (1980). But see *Chipstead v. Oliver*, 137 Ga. 483 (2) (73 SE 576) (1912).[12]

In any event, the evidence in this case shows that the action of the DOT, in indefinitely suspending Shepherd as a qualified bidder for future DOT contracts while allowing Shepherd to complete existing contracts, did not constitute an abuse of discretion. Rather, the DOT exercised its discretion in balancing competing state interests, i.e., the interest of the state in not paying additional millions of dollars for DOT construction projects versus another interest of the state in insuring that DOT contracts are awarded through free and open competition.

3. In our opinion, Shepherd's conviction for bid rigging evinces a greater degree of culpability than its violations of the Probationary Agreement and the court-ordered restitution. Therefore, if the trial court were authorized to order the Shepherd/DOT contract rescinded on public-policy and abuse-of-discretion grounds as a result of the latter two violations, it would necessarily follow that the trial court would be authorized to invalidate all contracts between the DOT and Shepherd, as well as other contractors convicted of bid rigging.

*Our Holdings in Case No. 42191*

4. The plaintiffs in this case attacked the transfer of land from the City of Atlanta to the DOT as "arbitrary, capricious, ultra vires, illegal, and unconstitutional." The trial court found standing based upon *League of Women Voters of Atlanta-Fulton County v. City of Atlanta*, 245 Ga. 301, 303 (264 SE2d 859, 860) (1980). We affirm

---

[12] Although *Chipstead*, supra, holds that municipal officials can be sued for a manifest abuse of discretion, it was cited approvingly in *Lewis Motor Co.*, supra, at p. 292 (5).

standing, under *Wells v. Mayor &c. of Atlanta*, 43 Ga. 67 (2) (1871), *Lewis Mtr. Co., Inc. v. Mayor of the City of Savannah*, 210 Ga. 591 (3) (82 SE2d 132) (1954), and our more recent opinions in *Dunaway v. City of Marietta*, 251 Ga. 727 (308 SE2d 823) (1983) and *Wyman v. Popham*, 252 Ga. 247, 248 (312 SE2d 795) (1984).[13]

5. Based upon Arrington's participation in the Shepherd contract, the trial court found that a conflict of interest existed, holding as follows:

"Because of his potential financial interest in Shepherd's apparent low bid, Marvin Arrington's presiding over the November 19, 1984 meeting of the City Council was contrary to Section 18-2004 of the Atlanta Code of Ordinances, which provides: 'The mayor, the president of council, any council member, official or employee of the city who has a private interest, direct or indirect, in any proposed legislation or any decision pending before such person or the body of which the person is a member or employee, shall not vote for or against, discuss, decide or in any way participate in considering the matter, but shall publicly disclose, on the official records of the body, the nature and extent of such interest, prior to any determination of the matter. The failure of any person to comply with requirements of this section and the failure of any person to refrain from participating in debate or voting on any matter will not affect the validity of any action taken by the city council.' " (Order, p. 9).

This finding of fact by the trial judge is supported by the evidence.

6. Notwithstanding, the trial court refused to invalidate the ordinance and the land transfer, and held that title had vested in the DOT.

It is true that the ordinance prohibiting conflicts of interest provides that such will not invalidate any action of the city council. However, the legal effect of this conflict must be determined by laws of statewide application which cannot, of course, be inhibited by a city ordinance. See *Montgomery v. City of Atlanta*, 162 Ga. 534 (134 SE 152) (1926), as follows:

"By the common law and independently of statute, this contract is contrary to public policy and illegal. One who is entrusted with the business of others will not be allowed to make out of the same a pecuniary profit to himself. This doctrine is based upon principles of reason, morality, and public policy. No public agent shall have the opportunity or be led into the temptation to make profit out of the

---

[13] See also *Newsome v. City of Union Point*, 249 Ga. 434, 436 (291 SE2d 712) (1982), which involved an attack upon a city ordinance on the *sole* basis of ultra vires. As the ordinance was plainly within the scope of the municipality's powers, such an attack was insufficient to generate standing.

public business entrusted to his care, by contracting with himself, directly or indirectly, in respect to such business. *Mayor &c. of Macon v. Huff*, 60 Ga. 221; *Hardy v. Gainesville*, 121 Ga. 327 (48 S.E. 921); *Byrd v. Cook*, 146 Ga. 657 (92 S.E. 61); *Twiggs v. Wingfield*, 147 Ga. 790 (95 S.E. 711, L. R. A. 1918E, 757); *Turner v. Atlanta*, 160 Ga. 216 (127 S.E. 652)." 162 Ga. at 546.

7. We view this aspect of the case to be governed by *Dunaway v. City of Marietta*, supra, and *Wyman v. Popham*, supra.

(a) Division 3 of *Dunaway v. City of Marietta* holds:

"The conduct of the chairman of the planning commission, who was also a vice president of the applicant corporation, is the basis of the allegation of fraud and corruption. The trial court granted summary judgment to the appellees, finding that any financial interest which the chairman had in the outcome of the decision was too remote and speculative as to affect the validity of the zoning. The court further found that under all the circumstances the evidence was insufficient to raise a question of fraud and corruption. We cannot agree. Although the court found the chairman's relationship to the applicant was disclosed to the council members with whom he spoke, and although the chairman never voted on the application when it was before the planning commission, the fact that he chaired the first planning commission hearing on the application raises a factual issue of whether that conduct tainted both that hearing and the subsequent hearing on the amended application. We therefore reverse the trial court's grant of summary judgment on this issue alone and remand the case for trial." 251 Ga. at 729.

In that case, the chairman presided over the first meeting of the planning commission which concerned the rezoning application. He did not preside over a second meeting, at which a recommendation favorable to the application was adopted. Further, the ordinance which effected the rezoning was adopted by a discrete body, the city council.

(b) Division 2 of *Wyman v. Popham*, supra, holds:

"One of the arguments appellants make in their remaining enumerations is that the trial court erred by ruling they had failed to carry their burden to demonstrate that the votes of two members of the three-person board of commissioners were influenced by their financial interest in the rezoning. There was testimony at trial that Popham, who is a real estate developer, is a customer of the two commissioners, and, in particular, that one of the commissioners sells him all of the sand he uses in his business, and that the other does all of Popham's gutter work." 252 Ga. at 247.

"The evidence in the record now before us is sufficient to authorize — but not require — the superior court to find fraud and corruption by the preponderance of the evidence, and we reverse and re-

mand for reconsideration of that issue in accordance with this standard." 252 Ga. at 248.

Note that in both of these cases we held that the evidence was sufficient to create an issue of fact as to fraud and corruption. In the case before us, the trial court has found, as a fact, the existence of a conflict of interest.

(c) See also *Olley Valley Estates, Inc. v. Fussell*, 232 Ga. 779 (208 SE2d 801) (1974), where we approved this observation: "Conceding that the difficulty of inquiring into the motives of municipal legislators may lead courts to follow the general rule of nonreview, it would appear that in zoning actions policy arguments urge that the general rule not be applied, and that action involving self-interested votes be invalidated." 232 Ga. at 783-784.[14]

8. From analysis of these later cases, of our earlier authorities as enumerated in *Montgomery v. City of Atlanta*, supra, and of our holding in *Trainer v. City of Covington*, 183 Ga. 759 (189 SE 842) (1937), we delineate that kind of conflict of interest which, in law, is the equivalent of fraud and corruption, as follows: when a public officer, in the discharge of his public function, acts upon a measure relating to a *specific transaction* and such transaction shall *directly* and *immediately* affect his pecuniary interest. Examples of matters excluded from such definition are measures which relate generally to tax and utility structures, and those which affect generally certain sectors of the economy. Included in such a definition are the circumstances treated in the authorities we have cited — and the circumstances of this case.

9. Following our holding in *Mayor &c. of Macon v. Huff*, supra — handed down in 1878 — we re-affirm this tenet: invalidity stems not from the actuality of monetary loss to the public body, but from the very existence of the conflict of interest. 60 Ga. at 228.

Absent countervailing factors, the trial court's finding of a conflict of interest demands the invalidation of the ordinance.

10. The DOT insists that the infirmity we have discussed should not serve to vitiate the transaction, inasmuch as it was entitled to rely upon the ordinance and the deed.

Here, too, we must disagree. The record shows that in mid-1984 the DOT and its Commissioner engaged in extensive correspondence with Shepherd and with Arrington, and were fully aware of Arring-

---

[14] Judicial review of the legislative acts of municipal governing authorities traditionally has been more intense than judicial review of the acts of the General Assembly. Compare *Great Atlantic &c. Tea Co. v. City of Columbus*, 189 Ga. 458 (2) (6 SE2d 320) (1939), with *Kelley v. State*, 252 Ga. 208 (312 SE2d 328) (1984). In deference to the function of the General Assembly in state government, the standard of judicial review customarily has been "relatively relaxed." 252 Ga. at 209. Ordinances are examined for reasonableness; acts of the General Assembly are reviewed for constitutionality. *Great Atlantic*, supra; *Kelley*, supra.

ton's financial interest in Arrington Enterprises. On October 26, 1984, the DOT announced that Shepherd was the apparent low bidder. That bid clearly identified Arrington Enterprises as a DBE subcontractor. Twenty-four days later, the land transfer ordinance was passed by the council, with Arrington presiding.

Under these circumstances, the DOT was charged with full knowledge of the conflict of interest, and cannot now rely upon the apparent regularity of the deed and the ordinance. Hence, the protections which equity would extend to a bona fide purchaser for value *and without notice* (OCGA §§ 23-1-19, 23-1-20 and 23-2-34) are inapplicable.

11. Accordingly, the trial court should have sustained the attack upon the land transfer ordinance and the deed, and that portion of the order denying relief upon this ground must be reversed. It should be noted, however, that the city council is now free to take such action as it sees fit relative to the possible disposition of the lands — subject, of course, to lawful procedures.

*Judgment in Case Nos. 42126 and 42127 reversed. All the Justices concur. Judgment in Case No. 42191 reversed. All the Justices concur, except Marshall, P. J., who dissents.*

HILL, Chief Justice, concurring.

I concur in the opinion of the court. I write to point out an additional aspect of Case No. 42127, the Shepherd appeal. The trial court found the Shepherd/DOT contract to be void because, at the time it was entered into, Shepherd was in violation of the record-keeping provisions of the Probationary Agreement and in default in making the third installment of the court-ordered restitution. However, the Probationary Agreement was between DOT and Shepherd, and DOT could insist on, or waive, the record-keeping provisions.

The restitution was court-ordered, but that court order did not provide that failure to make timely restitution payments would preclude Shepherd from entering into other contracts with DOT. In effect, the trial court's order voiding the Shepherd/DOT contract retroactively added conditions to Shepherd's court-ordered probation, to wit: You will keep records as required by your Probationary Agreement with DOT; you will make restitution payments on time; and if you fail to do so, any contracts entered into with DOT will be void.

A court may not add conditions to court-ordered probation, make such conditions apply retroactively, then find that such conditions were not complied with and impose sanctions for their breach. See *Huff v. McLarty*, 241 Ga. 442 (246 SE2d 302) (1978); *England v. Newton*, 238 Ga. 534 (233 SE2d 787) (1977); *Harrell v. State*, 162 Ga. App. 111 (2) (290 SE2d 213) (1982).

For this additional reason, I join the judgment in Case No. 42127.

As for Case No. 42126, DOT was not on probation.

MARSHALL, Presiding Justice, dissenting in part.

In primary reliance on *Dunaway v. City of Marietta*, 251 Ga. 727 (308 SE2d 823) (1983) the majority strikes down the Atlanta ordinance transferring to the DOT parklands to be used as rights-of-way for the Presidential Parkway. The ordinance is struck down, because Council President Arrington presided over the council meeting while the ordinance was under consideration, and, at the time, Arrington was a subcontractor on Shepherd's contract with the DOT for the grading and paving of the parkway.

In *Dunaway*, we dealt with a situation in which the chairman of a city planning commission presided over a meeting at which a certain application for rezoning was initially considered, and the application for rezoning was filed by a corporation of which the chairman was an officer. The chairman did not vote on the rezoning application, and he testified that he disclosed his relationship to the rezoning applicant to other council members with whom he spoke. The complainant charged that the chairman lobbied council members to rezone the property. We held that an issue of fact was raised as to whether the chairman's conflict of interest tainted the approval of the rezoning application. Thus, the conflict of interest in *Dunaway* was egregious. The conflict of interest in this case is attenuated and indirect. Therefore, on its facts *Dunaway* is readily distinguishable from this case.

Nonetheless, there is a line of cases in which the governing body of a municipality contracted with one of its members for the rendition of services for, or the sale of goods to, the municipality. *Trainer v. City of Covington*, 183 Ga. 759 (189 SE 842) (1937); *Montgomery v. City of Atlanta*, 162 Ga. 534 (134 SE 152) (1926); *Mayor &c. of Macon v. Huff*, 60 Ga. 221 (1878). In these cases, it was held that the contract was absolutely void as against public policy, even though the council member with whom the municipality contracted did not vote for the contract, exercise his influence in procuring members of the council to vote for its approval, and although it was free from fraud.

Here, the Atlanta City Council did not contract with one of its members. Rather, the council enacted an ordinance swapping properties with a state executive agency, with the agency using the property thus obtained as rights-of-way for a parkway on which the council president was, but no longer is, a subcontractor. In addition, the city council was under a statutory duty to assist the DOT in procuring the rights-of-way for the parkway. OCGA § 32-3-3 (e). To this extent, the previously cited cases are distinguishable from this case.

These cases do strongly condemn a municipal contract awarded by the municipal council to one of its members. However, all of the cases nonetheless held that the complainants in equity could not have

those contracts declared void unless they restored the contracting party to the position occupied prior to entry into the contract, where the contracting party had changed his position and expended money in reliance on the contract. It is a combination of this universal principle and the doctrine of laches which, in essence, constitutes the basis for the superior court's denial of equitable relief here.

The majority holds that since the DOT knew that Arrington was a subcontractor on the parkway project, it was not an innocent party entitled to rely on the apparent validity of the land-transfer ordinance. However, this ordinance, which authorized and accompanied the deed transferring the land to the DOT, expressly stated that Arrington abstained from voting on the ordinance. The majority opines that the Atlanta City Council "is now free to take such action as it sees fit in the future relative to the possible disposition of the lands, subject, of course, to lawful procedures." Apparently, under the majority's view, if Arrington had abstained from presiding over the council meeting while the ordinance was under consideration, as well as from voting, the ordinance would be valid. Under the venerable principle that it is presumed that public officials will faithfully discharge their duties in compliance with law, *Truluck v. Peeples*, 1 Ga. 1 (1846), it would seem that the DOT was not on constructive notice that the council president would fail to perform his duty, which, as held in the majority opinion, was for him to have abstained from presiding over the council meeting as well as from voting.

I therefore respectfully dissent.

DECIDED APRIL 23, 1985 —
REHEARINGS DENIED MAY 9, 1985 AND MAY 10, 1985.

*Michael J. Bowers, Attorney General, James P. Googe, Jr., Executive Assistant Attorney General, Marion O. Gordon, First Assistant Attorney General, Roland F. Matson, William C. Joy, Senior Assistant Attorneys General, Charles M. Richards, Assistant Attorney General, Beverly B. Martin, Staff Assistant Attorney General,* for appellants (case no. 42126).

*Richard N. Hubert, Orr & Edwards, W. Fred Orr II,* for appellees.

*Schreeder, Wheeler & Flint, David H. Flint, Lynn C. Stewart,* for appellants (case no. 42127).

*Richard N. Hubert,* for appellees.

*Richard N. Hubert, Orr & Edwards, W. Fred Orr II, Ferguson & Dorn, Sally A. Dorn,* for appellants (case no. 42191).

*Marva Jones Brooks, Kendric E. Smith, Overtis Hicks Coopwood,* for appellees.

*Alston & Bird, Sidney O. Smith, Jr., Anne S. Rampacek, Ches-*

*nut & Livingston, J. David Chesnut,* amici curiae.