75812, 75813. NATIONAL CONSULTANTS, INC. v. BURT et al.;
and vice versa.
(366 SE2d 344)

BIRDSONG, Chief Judge.

Appellees/plaintiffs (hereinafter called Burt and/or Evans) each brought actions against the appellant/defendant, National Consultants, Inc. (hereinafter called National), arising out of an alleged breach of contract between the parties; Burt and Evans were seeking damages for nonpayment of renewal commissions. The cases originally were filed as separate actions in the superior court. After filing its answer, National amended its answer to add a counterclaim for those commissions paid to Burt and Evans, which National alleges were wrongfully claimed by Burt and Evans because they were in breach of their contract with National. The two cases were consolidated and were tried before a jury. The jury returned a verdict in

favor of Burt and against National in the amount of $27,000, and in favor of Evans and against National in the amount of $48,816. National filed a motion for a new trial in both cases, and Burt filed her motion for judgment notwithstanding the verdict and motion for new trial. The trial judge denied all of these motions (and had previously denied Burt's motion for a directed verdict made at the close of the evidence). National has appealed asserting three enumerated errors, including the failure of the trial judge to grant its motion for a new trial. Burt then filed a cross-appeal alleging that the court erred in failing to grant her motion for a new trial and in failing to grant her motion for judgment notwithstanding the verdict. *Held*:

## *Case No. 75813 (The Cross-Appeal)*

1. The order of the trial judge denying National's motion for new trial and Burt's motion for judgment notwithstanding the verdict was filed on July 7, 1987. This order was later amended, on October 12, 1987, to reflect that Burt's motion for a new trial was also denied, as this fact had been omitted, apparently due to inadvertence, from the original order. National filed its appeal to the order on July 10, 1987, and mailed Burt notice thereof on July 16, 1987. Burt filed her cross-appeal on August 17, 1987, and twice amended it.

OCGA § 5-6-38 (a) pertinently provides that "appellee may institute cross appeal by filing notice thereof within 15 days from service of the notice of appeal by the appellant." OCGA § 5-6-32 (a) states that "[s]ervice of any . . . notice may be perfected either before or after filing with the clerk . . . and when service is made by mail it shall be deemed to be perfected as of the day deposited in the mail." Further, OCGA § 9-11-6 (e) provides that "[w]henever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice . . . other than process, upon him, and the notice . . . is served upon him by mail, three days shall be added to the prescribed period." Construing these statutory rules in the manner most favorable to Burt, and further considering that the record before us reflects no time extension for the filing of this cross-appeal within the meaning of OCGA § 5-6-39 (a) (2), we find that the cross-appeal was not timely filed. The cross-appeal therefore is dismissed and will not be considered by this court. OCGA § 5-6-48 (b) (1).

## *Case No. 75812 (The Main Appeal)*

2. Appellant/National's first enumerated error is that the trial court erred in striking the typewritten portion of the General Agent's contracts (the two addendums) which were admitted at trial as exhibits of the plaintiff/appellees.

Plaintiff/appellees, Burt and Evans, were originally employed with National pursuant to an agent's contract commonly referred to as a Career Shop Contract. Pursuant to the terms of the Career Shop Contracts, each agent was to receive, as a commission, 40 percent of the original premium paid on each policy of insurance sold. After the first year premium was paid, they also would receive ten percent of any renewal premiums paid on each policy. Managers in addition were entitled to a five percent "override" of his team's business. Appellees were guaranteed to receive these renewal commissions for as many years following termination of their employment with National as equalled their years of employment with the company. Thus, under this particular contract, if an agent worked for the company for five years, the agent would be guaranteed receipt of his or her commission from renewal premiums for five years. The Career Shop Contract makes no express reference to and contains no express restriction of agents working for another insurance company, although this apparently was the company policy of National. In August 1983, both appellees signed agency contracts with another company, as they believed their employment with National was in jeopardy. In November 1983, both appellees signed new agent contracts with National. These printed contracts, known as General Agents Special Vested Commission Contracts, contained a typewritten addendum thereto which provides as follows: "It is understood that [Burt/Evans] will receive renewals under her Career Shop Contract for [five years as to Burt] [six years as to Evans] or as long as she does not represent any other insurance company other than United American *and* must produce thirteen (13) applications per quarter, *and does not take any other employment*, and does not do anything that is determined to National Consultants." (Emphasis supplied.) In March 1984, Evans was fired from National, and on March 30, 1984, Burt resigned. Both appellees thereafter made demands for their commissions, but to no avail.

National maintains that appellees grew concerned with their position at National and with certain company policies during the time of their Career Shop contracts. Noting this concern, National asserts that it offered both ladies an opportunity to enter a General Agent's contract. Appellees maintain that, although they each signed a General Agent's contract and shortly thereafter an addendum, the addendum was signed by Evans, who felt compelled to sign it, and by Burt while she was upset. The evidence is in conflict as to whether the addendums were physically attached to the General Agent's contracts. The addendums were not prepared by an attorney. Appellee Evans testified that in response to her question concerning the scope of the typewritten addendum she was first informed that she could do no volunteer work but then was told she could do volunteer work but

could not work any place else. Each addendum was substantially similar and on its face modifies paragraph 17 of the General Agent's contracts. Paragraph 17 pertinently provided that "any commissions or renewal commissions due or to become due the agent under any previous contracts or agreements shall not be affected hereby."

At the conclusion of the evidence, the trial judge ruled that the addendum in each of the appellees' General Agent's contract is illegal, as it is in restraint of trade and contrary to Georgia law. The court concluded that as the addendum is contrary to law it therefore did not raise "a contract issue that can be presented as a factual dispute to a jury," and further that "the [appellees] as a matter of law were not in breach [of contract] at the time of the execution of the contract, because the [addendum's] provisions that [National] urges they were in breach of [are] contrary to law." Subsequently, the trial judge stated that "the addendum is not adjusted as to time, as to place, as to territory, and that it totally prohibits either of these women from seeking any further employment . . . [a]nd that it is conjunctive, not disjunctive."

The Georgia Constitution declares that any contract or agreement which "may have the effect of or which is intended to have the effect of defeating or lessening competition" is unlawful and void. Ga. Const. 1983, Art. III, Sec. VI, Par. V. Further, OCGA § 13-8-2 in part provides that: "(a) A contract which is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include *but are not limited to* . . . (2) Contracts in general restraint of trade. . . ." (Emphasis supplied.)

It is well settled contract law that the parties thereto are free to contract about any subject matter, on any terms, unless prohibited by constitutional law, statutory law, or public policy. See *Petroziello v. U. S. Leasing Corp.*, 176 Ga. App. 858, 860 (338 SE2d 63). However, under the facts of this case, if the addendums are determined even to be in partial restraint of trade they could not meet the "rule of reason" (test of reasonableness) to which this court referred in *Club Properties v. Atlanta Offices-Perimeter*, 180 Ga. App. 352 (3) (348 SE2d 919), particularly as the addendums are not reasonably limited either as to the scope of territorial applicability (the restrictions appear to be enforceable worldwide), or as to the nature of the proscribed activities (all conceivable forms of other employment are restricted). See generally *McNeal Group v. Restivo*, 252 Ga. 112 (311 SE2d 831) (restrictive covenant invalid which in effect prohibited employee from work for any competitor in any capacity); *Ward v. Process Control Corp.*, 247 Ga. 583 (277 SE2d 671) (covenant held to be unreasonable regarding the scope of the prohibited business activities); *Horne v. Drachman*, 247 Ga. 802, 805 (280 SE2d 338) (covenant prohibited employee from being an employee in any capacity with a

competitor); *Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181 (236 SE2d 265) (territorial restrictions too broad).

Scrutiny of the addendums signed by Burt and Evans reveals that they do not mirror provisions previously held by our courts to be in general or partial restraint of trade. Rather, these addendums contain contract provisions which impose certain *conditions* on the receipt of commissions based on the future renewals of policies sold by or credited as being sold by Burt and Evans. In *Sheppard v. Columbus Pkg. Co.*, 146 Ga. App. 202 (245 SE2d 887), this court held that "a provision of a contract which imposes as a condition to the recovery of benefits under a deferred compensation plan that the employee refrain from engaging in *competitive employment* is not violative of public policy as being in restraint of trade." (Emphasis supplied.) Id. at 203. Thus, if the restriction in the contract does not preclude the employee from engaging in *competitive activity*, but simply provides for the loss of rights or privileges if he does so it is not in restraint of trade. *Brown Stove Works v. Kimsey*, 119 Ga. App. 453 (2) (167 SE2d 693). These cases are based on the precedent contained in the Supreme Court case of *Collins v. Storer Broadcasting Co.*, 217 Ga. 41 (2b) (120 SE2d 764). In *Collins*, it was held that a contract which in effect provided for the forfeiture and divestment of profit sharing rights in the event the employee engaged in certain competitive employment within a three-year period following his termination of employment, was not in violation of public policy as being in restraint of trade. The Supreme Court noted that "this contract was entered into solely as a condition precedent to his becoming a participating employee member of the profit sharing plan, and that the employer has neither taken nor threatened to take any action against the plaintiff by reason of the contract." Id. at 50-51. Applying this precedent to the case at bar, we are satisfied that the addendums, as properly interpreted, did not contain any provision which in the classic sense was either in general or in partial restraint of trade. Rather, the addendums primarily provided for a conditional *forfeiture* of certain previously vested rights to commissions that were to be based on a percentage of those future renewal premiums paid on policies already sold or credited to Burt and Evans.

While we find that the addendums, as written, do provide for a conditional forfeiture of benefits within the meaning of *Sheppard*, *Brown Stove Works*, and *Collins*, the terms of the addendums differ significantly from the contract provisions considered in these cases. In each of the three cited cases, the contract provisions contained some type of restriction from engaging in *competitive* employment or activity. The degree of specificity of the restrictions varied in each case, but the contract restrictions all related to the prevention of activity or employment that could be in *competition* with the employer. In the

addendums under consideration, however, the restriction on employment is of the broadest nature. What is prohibited in the addendums before us is *any type of employment* worldwide for an ill-defined period of probably five and six years, respectively.

The "freedom of individuals to contract" is part of the basic liberties enjoyed by the citizens of this state and should not be interfered with in the absence of clear necessity. So important is this freedom that our legislature is prohibited from passing laws impairing the obligation of contract. Ga. Const. 1983, Art. I, Sec. I, Par. X. And, in our judiciary the law is well settled " ' "that contracts will not be avoided by the courts as against public policy, except 'where the case is free from doubt and where an injury to the public interest clearly appears.' " ' " *Porubiansky v. Emory Univ.*, 156 Ga. App. 602, 603 (275 SE2d 163), affirmed 248 Ga. 391 (282 SE2d 903), citing *Cash v. Street & Trail*, 136 Ga. App. 462, 465 (221 SE2d 640). "A contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is contrary to good morals and contrary to law, or unless the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of law." Id. at 603. Further, "the courts must exercise extreme caution in declaring a contract void as against public policy and should do so 'only in cases free from doubt.' " *Emory Univ. v. Porubiansky*, 248 Ga. at 393.

In OCGA § 13-8-2, the General Assembly declared that any contract which is against the "policy of the law" of this state is unenforceable. By specifically providing in this same statute that the types of contracts which are deemed to be contrary to public policy "include but are not limited to" those types listed therein, the General Assembly clearly evidenced its legislative intent that our courts would not enforce any contract provision found to be contrary to public policy, within the meaning of OCGA § 13-8-2, whether or not it was of the exact category of contracts listed in subsections (a) (1) through (5) and (b) of the statute. While this statutory provision places a responsible burden upon the courts, it does not give them carte blanche authority to declare at will any contract to be violative of public policy. The courts should, wherever possible, avoid establishing public policy, unless the need and principle involved is clear and convincing. *Porubiansky v. Emory Univ.*, 156 Ga. App. at 610, supra (Deen, C. J., concurring specially). Thus, each case requiring public policy considerations must be carefully weighed on its own merits, and by applying the appropriate legal guideline to the particular facts presented to the court.

The covenant contained in each addendum is a form of forfeiture provision. It is a well-established rule that forfeiture of rights under valid legal contracts is not favored under the law. Cf. *Waldrop v. Bet-*

*tis*, 223 Ga. 715, 720 (157 SE2d 870) (contract forfeiture clause). Further, in the addendums under consideration, the employees are required, in part, either to *forego any type of employment or* to *forfeit* certain vested rights to future commissions. Such ultrabroad, anti-employment provisions clearly raise serious questions of public policy principle. Accordingly, we will carefully examine these particular covenants to determine whether such agreements are in violation of public policy.

The long-term effect of condoning this type of ultrabroad forfeiture provision is clear. Such provisions would tend to encourage citizens who need to be gainfully employed to refrain from seeking such employment in order to obtain whatever benefits they otherwise would forfeit under the terms of their particular contract. Further, we recognize two additional factors. The first is the unequal bargaining position of most employees when negotiating employment contracts. See generally *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 325 (320 SE2d 170). Secondly, in this case, the employer, National, has either no significant business interest or a substantially reduced business interest in prohibiting Burt and Evans from engaging in subsequent noncompetitive forms of employment. In fact, the transcript reveals that National, through its counsel, expressly declined at trial to present evidence to "show that there are good reasons why somebody ought not be allowed to have another job."

Balancing all of the above considerations against the basic freedom to contract enjoyed by the citizens of this state, we find that the type of *ultrabroad* forfeiture provision, found in these particular addendums, clearly could cause injury to the public interests of this state. We further find that the evidence adduced at trial establishes that the meaning of offending provisions contained in the addendums is not ambiguous and is free from doubt.

We conclude that the provision in each addendum prohibiting Burt or Evans from engaging in "any other employment" is contrary to the public policy of this state and therefore unenforceable. OCGA § 13-8-2 (a). Accordingly, we find that the trial judge did not err in his ruling that the addendums contained provisions contrary to public policy, and it matters not that his determination primarily was grounded on a finding that each addendum provision was in restraint of trade. A correct decision of the trial court will not be reversed, regardless of the reasons given therefor. *Coker v. City of Atlanta*, 186 Ga. 473 (1) (198 SE 74).

3. Appellant National's second enumerated error is that the trial court erred in striking the typewritten portion (the addendums) of the General Agent's contracts and then allowing the remainder of each contract to remain in effect to the prejudice of the defendant.

The "blue-pencil theory of severability" has not been viewed with

favor in cases involving covenants in restraint of trade in employment contract cases, because "[i]f severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable." *Rita Personnel Svcs. v. Kot*, 229 Ga. 314, 317 (191 SE2d 79). This same general policy appears equally applicable to the situation before us. Nevertheless, OCGA § 13-1-8 provides that: "(a) A contract may be either entire or severable. In an entire contract, the whole contract stands or falls together. In a severable contract, the failure of a distinct part does not void the remainder. (b) The character of the contract in such case is determined by the intention of the parties."

As a general rule of construction, in cases involving the issue of severability, " ' "[w]here an instrument in writing, purporting to be a bilateral contract, contains mutual promises, which without more and when taken independently of certain subsidiary provisions in the instrument would render the instrument valid as a contract, such subsidiary provisions will not, unless their terms imperatively demand it, be given a construction that will nullify and completely destroy the entire obligations of either party under the instrument and thus render the instrument lacking in mutuality and void." [Cits.] "The rule is that where an agreement consists of a single promise, based on a single consideration, if either is illegal, the whole contract is void. But where the agreement is founded on a legal consideration containing a promise to do several things or to refrain from doing several things, and some only of the promises are illegal, the promises which are not illegal will be held to be valid." ' " *O. H. Carter Co. v. Buckner*, 160 Ga. App. 627, 628-629 (287 SE2d 636), and cases cited therein; see *Department of Transp. v. Brooks*, 254 Ga. 303 (1) (328 SE2d 705).

However, under the dictates of OCGA § 13-1-8, the "primary task" in determining contract severability remains that of ascertaining the intention of the parties. *Kem Mfg. Corp. v. Sant*, 182 Ga. App. 135, 140 (355 SE2d 437). Specifically, it must be ascertained if the parties in the case at bar intended that "the entire [General Agent's] agreement be premised upon the validity of the covenant[s]" contained in the so-called addendum. *Horne v. Drachman*, supra at 806.

The evidence in this case clearly would support a finding that the parties intended for the printed provisions in the General Agent's contract to be enforceable independently of the covenants contained in the addendum. Although neither the main body of the contract nor its addendum contained a severability clause, this factor, while significant in determining the parties' intent, is not per se dispositive of the severability issue. It is the testimony of the parties in this case that is

most persuasive in the resolution of their intent. Burt and Evans both testified concerning their desire to obtain a General Agent's contract. However, after their signing of the main body of this contract, they were unexpectedly presented by National's president with the nonstandard typewritten addendum. Burt testified that she signed the addendum when she was "upset," and Evans testified that she signed it believing she had "no choice." It is clear from the totality of their testimony that neither Burt nor Evans intended for the addendums to be a nonseverable part of their General Agent's contracts. Rather they executed these supplements to their contract believing that National would not otherwise give them General Agent status. The president of National testified that National "wouldn't have a Career Shop if I let people go from the Career Shop to a general agent's contract and not have some restrictions for them to continue to receive all the benefits of working with the Career Shop." However, he also testified that the addendums were drafted to benefit Burt and Evans by providing a means for them to continue to earn renewal commissions; that Burt and Evans had a choice whether to sign the addendums; and, that "[t]hey could have signed just this [General Agent's] contract. . . . They had that choice." The inference, which can be drawn from this testimony, is that National too intended that the addendums would be severable from the main body of the General Agent's contracts.

We are satisfied, based on the posture of the evidence, that the trial judge did not err in declining to rule as a matter of law that the General Agent's contracts were invalid.

4. Appellant's third assignment of error is that the trial court erred in failing to grant a new trial on the general grounds in view of the fact that the jury's verdict was contrary to the law and to the evidence in two instances: First, that Burt and Evans were in breach of the General Agent's contracts and therefore should not have been allowed to recover damages under that contract; secondly, that Burt and Evans failed to introduce any competent evidence upon which the jury could base a concrete, nonspeculative award of damages. Appellant's claim of breach of contract primarily is based on allegations that Burt and Evans violated the terms of the addendum. As the addendum is null and void, failure to comply with its terms cannot form the basis of a legitimate breach of contract claim. Appellant also asserts that Burt was in breach of paragraph 15 of the General Agent's contract, which pertinently provides for the forfeiture of renewal commissions in the event the agent "induce[s] any policyholder to lapse, relinquish or surrender a policy with United American . . . ." (National's agents sell United American policies). In support of this assertion, National relies upon the testimony of Burt wherein she admits to selling other insurance policies to 100 or more United Ameri-

can policyholders. This testimony does not establish a breach of paragraph 15. The mere act of selling another company's insurance policy to a policyholder of United American does not establish that the policyholder was induced in any manner to lapse, relinquish or surrender the United American policy. In fact, many people own and renew insurance policies issued by more than one insurance company. Breach of contract cannot be established by speculation alone.

We also find that appellant's claim that Burt and Evans have failed to introduce adequate evidence upon which the jury could base its award of damages is without merit. It is true that "[d]amages growing out of a breach of contract, in order to form the basis of a recovery, must be such as can be traced solely to the breach, must be capable of exact computation, must have arisen naturally and according to the usual course of things from such breach, and must be such as the parties contemplated as a probable result of the breach." *Leader Nat. Ins. Co. v. Smith*, 177 Ga. App. 267, 279 (339 SE2d 321); *Lankford v. Trust Co. Bank*, 141 Ga. App. 639, 641 (234 SE2d 179). An award of damages cannot be based on guesswork. *Lingo v. Kirby*, 142 Ga. App. 278 (236 SE2d 26). However, where the damages awarded are "within the range of the conflicting testimony," this court will not reverse the judgment. See *Campo Constr. v. Stembridge*, 138 Ga. App. 555, 557 (226 SE2d 797); *Department of Transp. v. Gunnels*, 175 Ga. App. 632, 636 (334 SE2d 197).

The jury awarded Burt the sum of $27,000 for commissions due between the date of her resignation and the end of the month of June 1986; and awarded Evans the sum of $48,816 for commissions due between the date of her firing and the end of the month of June 1986.

A certified public accountant testified on behalf of Burt and Evans as to the amount of damages suffered by their loss of commissions. This expert witness calculated an amount of renewal commissions allegedly owned by National to both Burt and Evans. The calculations of the expert were based on certain computer records, which were available only for a period which terminated at the end of June 1984, and on a mathematical formula used to determine the amount of commissions allegedly due after the end of June, a period of time for which the expert had no access to computer records. The appellant/defendant vigorously cross-examined this expert and produced the testimony of two witnesses in an attempt to further discredit his testimony.

We are satisfied that the award of damages by the jury falls within the range of damages established by the testimony of this expert, and that the award of only $27,000 to Burt can be satisfactorily explained as the jury's honest attempt to follow the trial judge's instructions concerning the rule for ascertaining damages, witness credibility and expert witness testimony. While the exact method which

the jury used to arrive at its results may not be readily identifiable, their award clearly is within the range of damages testified to and calculated by the expert, as this range starts with $0 and either is equal to or exceeds the amount of the jury's award as to each appellee/plaintiff. Further, we note that the contents of plaintiffs' exhibits 8 and 10 were not forwarded by the appellant for our consideration, notwithstanding the expert's use of certain information contained therein in arriving at his opinions.

*Judgment in Case No. 75812 affirmed. Appeal in Case No. 75813 dismissed. Banke, P. J., and Beasley, J., concur.*

DECIDED FEBRUARY 8, 1988 —
REHEARING DENIED FEBRUARY 24, 1988 — 

*Thomas J. Browning, Jerry A. Landers, Jr.,* for appellant.
*George W. Carreker,* for appellees.